STATE OF NEBRASKA, APPELLEE, v. HAROLD J. L. IRWIN, APPELLANT.

214 N. W. 2d 595

Filed January 25, 1974. No. 38515.

Eugene C. Foote, II, and John A. Wolf, for appellant.

Clarence A. H. Meyer, Attorney General, and Ralph H. Gillan, for appellee.

Heard before SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

CLINTON, J.

On February 17, 1972, the defendant was found guilty by a jury of six charges of rape and one of robbery. The offenses each occurred on separate dates from April 21, 1969, to February 21, 1971, and all occurred in or near Hastings in Adams County, Nebraska. All the charges were tried together. On the last offense, the robbery (which was accompanied by an unsuccessful sexual assault), the defendant was sentenced to a term of 20 to 25 years. At that time proceedings under the sexual sociopath act, sections 29-2901 to 29-2910, R. S. Supp., 1972, were pending. The defendant appealed the sentence. The trial court declined to proceed with the proceedings under sections 29-2901 et seq., R. S. Supp., 1972, on the theory it had lost jurisdiction because of the appeal on the robbery count. We heard the appeal and without decision retained jurisdiction on the robbery charge but remanded the cause for sexual sociopath proceedings because we felt the appeal was premature since no sentence had been imposed or other final determination made on six of the counts of the information. Dodge v. People, 4 Neb. 220; Kennedy v. State, 170 Neb. 193, 101 N. W. 2d 853. On remand the hearings under the sexual sociopath act were held, at the conclusion of which, a jury having been waived by the defendant, the court found that the defendant was a sexual sociopath; that the defendant could not benefit from treatment; and that the defendant be committed

to the Nebraska Penal and Correctional Complex for an indefinite period pursuant to the provisions of section 29-2906, R. S. Supp., 1972. From this finding and judgment of the court, the defendant has now appealed and we have before us all seven charges. The first five errors claimed here on appeal are common to all the charges. The sixth and seventh relate only to defendant's commitment to an indefinite term under the sexual sociopath statute.

The errors assigned and argued here are that the trial court erred: (1) In denying the defendant's motion to suppress a confession and certain other evidence because all these were the fruit of an illegal arrest; (2) in denying suppression of the confession because the defendant was unlawfully deprived of counsel contrary to Miranda; (3) in permitting the confession to be received in evidence because it was obtained by promises expressed or implied and the exertion of improper influence; (4) in denying the defendant's motion for a change of venue; (5) in denying defendant's various motions for mistrial; (6) in its finding that the defendant was a sexual sociopath and could not benefit by further treatment; and (7) that sections 29-2901 to 29-2910, R. S. Supp., 1972, are unconstitutional. We affirm.

An outline of events preceding the defendant's arrest and immediately following the arrest up to the time of his arraignment in the county court as known by the investigating officers and as shown by the evidence adduced at the suppression hearing before the District Judge is necessary for the disposition of the first three assignments.

As already noted, the series of offenses occurred from April 21, 1969, to February 21, 1971. The defendant was apprehended on Friday, October 1, 1971. Bobbie D. Henry, a deputy sheriff of Adams County for 7½ years and a member of the Hastings police department for 7 years prior to that, had among his duties been

assigned to investigate the rapes. It was an investigation in which both the sheriff's office and police department participated. Gary W. Hansel, criminal investigator for the Nebraska State Patrol, was on call in connection with the investigation and had been participating for about a year prior to October 1, 1971.

The crimes had followed a pattern. Access was gained to the various homes by stealth or in some cases by breaking. Evidence indicated that in some instances there was prior window peeping. In each instance prior to a sexual assault a demand was made for money which the victims might have in their homes or on their person. After the money was obtained the sexual assault took place. On each occasion save one the perpetrator used a weapon (a gun, knife, or other sharp object), or physical violence, or both, to impose his will and accomplish his purpose. Save in the last case he wore a mask or otherwise kept his face from observation of the victim and up until October 1, 1971, no victim had seen the uncovered face of the perpetrator.

There had also occurred in or near Hastings, Nebraska, a number of burglaries shortly prior to October 1, 1971. Some of these had occurred in the neighborhood where Irwin was first observed on the night he was apprehended. There had also been reports of a prowler or prowlers in the neighborhood just a couple of nights before. The neighborhood was residential.

In connection with one of the rapes and robberies a description of an automobile used by the perpetrator had been obtained. This description fitted that of an automobile owned by the defendant and in which he was observed on October 1, 1971. The defendant and his car had previously been observed by Hansel near the scene of two burglaries which had taken place at an earlier time.

The defendant Irwin had prior to October 1, 1971, been considered a possible suspect by Henry and the

other law enforcement officials because they knew of his having had a record of sexual offenses in McCook where he had formerly lived and of his having been as a consequence committed to the State Hospital at Hastings for treatment.

Hugh Elliott, who had lived in Hastings for almost 60 years and had been an automobile dealer there all his adult life, lived at 124 University in the city of Hastings. During the months of August and September 1971 he observed on several nights a week and on almost every Friday night a small sports coupé which was parked near his residence. It would show up about dark and was usually gone by 10:30 or 11 o'clock p.m. At first it was parked in what had been an alley at a point which was unlighted because the street light was burned out. The light was replaced and thereafter the car was parked east of Elliott's residence in the shadow of a huge evergreen tree. Elliott had, however, until shortly before October 1, never observed the driver of the car. Some time in September Elliott observed that a group of ferns in his yard beneath a window of his home had been badly trampled. He suspected a prowler or a window peeper and a possible connection with the parked car. He knew of the rape incidents. He decided to investigate. One evening he parked his own car on the street about 75 feet from where the suspect's car was parked. He already knew the license number of the car was Nebraska 14-F820. On the evening in question after waiting about an hour a man walking at a brisk pace came from the north. When the man reached the area illuminated by street lights he ran very fast and got into the car and "peeled out."

Following this incident Elliott was at the courthouse and he told deputy Henry about the incident and the occurrences and was advised by Henry to call immediately the next time the car showed up. Within a few days the car showed up again about 8:30 p.m. This

was October 1, 1971. Elliott was just arriving home in his car from his place of business as the other car drove up. As Elliott passed the car to go into his own driveway the car was started and with lights off was driven a couple hundred feet across an intersection and stopped. After a brief interval the driver got out and took off up the street in the direction from which the witness had seen him come on the earlier occasion. Elliott then called the sheriff's office and reported the presence of the car.

The call was relayed to deputy Henry who picked up Hansel and went to a point where the car could be observed and there he parked. This was about 9:45 p.m. He already knew from the license plate number and his prior investigation that the car belonged to Irwin. Henry related to Hansel what he had been told by Elliott. After a wait a person came from the north, got into the car and pulled out. Henry and Hansel followed and after a few blocks pulled up behind Irwin's car, apparently with beacon flashing. Irwin stopped. It was raining hard at the time. Both officers got out of their car. Henry approached the Irwin car on the left side. Irwin rolled down the window. Henry showed his badge and asked Irwin if he would come down to the sheriff's office as he wanted to talk to him. In the meantime Hansel had gone around to the right side of the car and rapped on the window. Irwin reached over and unlocked the door. Hansel opened it and asked if he could ride to the sheriff's office with him. Irwin said he could and Hansel got in. On the way to the station Irwin asked Hansel what they wanted to talk to him about and Hansel told the defendant that he thought he knew what they wanted to talk about.

Both officers testified that when they stopped Irwin and asked him to come to the station to talk neither had any intention of arresting him and did not tell him or indicate to him that he was under arrest. Henry

testified specifically that if Irwin had refused to go to the station he could have gone his own way.

When they reached the sheriff's office Henry got out of his car and walked to the front of it. At that point Irwin was getting out of his car on the left side. Henry testified: "A. As he got out of the automobile, we would be facing south, he got out and turned like this (indicating), and I could see his right arm go down by his leg. At this time I heard something drop on the pavement. I could see his right leg trying to move something underneath the car. Q. What was this object? A. I asked him what it was, and he told me it was a knife. I can't remember if he picked it up and gave it to me, but I think he did. Q. You have described this knife? A. Well, I seen it when we got into the office in the light. It was a fluorescent orange knife with a switch blade and with a U-shaped blade on the other end with a full blade for cutting rip cords. They identified it to me as a paratrooper's knife."

Hansel testified that Irwin would not have been free to go after the knife was dropped and identified.

About a week or 10 days previous to October 1, 1971, Henry had investigated a burglary in the city which had taken place at that time. Among the items taken was a paratrooper's knife which fitted the description of the knife obtained from Irwin just after he got out of his car. While Hansel began to talk to Irwin in the sheriff's office, Henry called one of the victims of the burglary. He came to the office and identified the knife as the one taken in the burglary. Henry then by office intercom informed Hansel, who was talking to Irwin in an adjacent room, of the identification.

Before Henry left Hansel and Irwin to make the phone call Hansel had, in Henry's presence and using the "Miranda card," given the Miranda warnings to Irwin and Irwin had affirmatively waived his rights. The questions and the affirmative responses of waiver are

set forth verbatim in the record and meet the requirements of Miranda.

The interrogation continued for about 1½ hours. During this time the defendant gave explanations of his whereabouts while away from his car on October 1, 1971, and other evenings when he was parked near the Elliott residence. He explained he had spent a good deal of time on the island in Heartwell Park nearby. He declined to comment on the knife. When asked about the various rapes he made no flat, direct denials or admissions, but stated that if he thought going to jail would help him any, "he would tell me about it." During that interrogation Irwin talked considerably of his arrest in McCook and his treatment there. A considerable portion of the conversation was about his prior treatment by law officers. Near the very end of the interview Irwin remarked: " 'Maybe I should talk to an attorney.' " Hansel then immediately got the telephone directory, opened it to the directory of attorneys in the yellow pages, and handed it to Irwin. Irwin looked at it and stated he did not know any attorneys. Hansel told him all of them were good. Hansel left the room but Irwin made no telephone call. There was no further significant conversation at that time. Irwin asked to call his wife and this he did.

Henry then took Irwin to a solitary cell and locked him in. Hansel saw Irwin in the sheriff's office on the next day, Saturday morning, but did not talk to him. On Saturday, search warrants were obtained and Irwin's house and garage were searched and articles believed to be the proceeds of burglaries were seized. After the search, on Saturday afternoon, Irwin was removed from his cell, the Miranda warnings were again given, and he apparently indicated his willingness to speak. There was at that time a brief interview in which Irwin was presented with the items found in the search and he then stated he would sort them out. The whole inter-

view lasted about 5 or 10 minutes. There was at that time apparently no conversation about the crimes which were involved in this appeal. Irwin's wife came to the sheriff's office that afternoon. Irwin wanted to see her but she declined to see him.

Hansel testified that on neither of the occasions when he interviewed the defendant were any threats, promises, or inducements made and that Irwin appeared normal and unemotional at all times. No one interrogated Irwin on Sunday or Monday morning.

On Monday afternoon about 2 o'clock Hansel removed Irwin from his solitary cell and took him to the sheriff's office. There he introduced Irwin to Lieutenant Parks, Supervisor of the Criminal Division of the Nebraska State Patrol for the eastern half of the State of Nebraska. Parks had come to Hastings from Lincoln at the request of the sheriff's office to interview Irwin. After the introduction by Hansel, Parks talked to Irwin about his background, "his past history." Irwin apparently gave a rather complete history, including the story of his previous commitment to the Regional Center. He then told Parks: ". . . he was guilty of the rapes that had occurred in Hastings the past two and a half years, and also the burglaries." Parks testified that he had not, prior to Irwin's admission of guilt, asked him any questions about the Hastings rapes nor given any warnings and that he had made no promises, threats, or inducements to get Irwin to tell him anything. Immediately after the admissions were made he then asked Irwin if he would talk to Hansel because he knew more of the details than did Parks. Irwin agreed. Hansel came in and Parks left.

At that time Hansel, using a tape recorder, administered the Miranda warnings and received affirmative waivers, and Irwin made a confession. The confession was in substantial detail, admitting all the offenses of which he was later found guilty. At some subsequent

time the defendant was interrogated by the county attorney before a court reporter. This interrogation was transcribed. The prosecution did not offer it, but the defense apparently knew of it and, on cross-examination of Hansel who apparently had at some subsequent time read it, had the witness read part of it into the record. This part, together with a portion of the questioning of the witness, was as follows: "Q. Question by Mr. Connolly: 'Now, what you have told me has been the truth? A. Yes. Q. And there have been no promises or threats or anything? A. No. I have the impression they will help me with my troubles.' Q. You had been with Mr. Irwin most of the time during his incarceration. Do you have any idea where he could have gotten an impression like that? A. No, sir. Q. He just must have made that up, as far as you know? A. I don't know where that came from. Q. You have no idea where he would get a thought like that? A. No, sir."

The defendant did not testify at either the suppression hearing or at trial.

### The Arrest and Probable Cause

The trial judge determined that the officers had probable cause for the arrest and did not attempt to decide precisely when the arrest occurred; whether it was when the stopping took place or later after the knife incident. The trial court further found the confession was voluntary and admitted both the confession and the knife into evidence.

The defendant first contends the arrest was illegal because there was a lack of probable cause, and that since the confession and the discovery of the knife were the fruits of the arrest, both should have been suppressed. He cites Henry v. United States, 361 U. S. 98, 80 S. Ct. 168, 4 L. Ed. 2d 134; Wong Sun v. United States, 371 U. S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441; and other cases. The State takes the position that no arrest

took place until after the knife incident and that the stopping was authorized under Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889; and Adams v. Williams, 407 U. S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612; that when the defendant attempted to dispose of the knife and deputy Henry recognized it as fitting the description of the rather unusual knife taken in a burglary a couple of weeks earlier, this, taken together with other circumstances known to the officers, gave probable cause for arrest.

We believe the principles enunciated by the Supreme Court of the United States in Adams v. Williams, *supra,* and by our own court in State v. Carpenter, 181 Neb. 639, 150 N. W. 2d 129, support the position of the State and that the issue may be decided on that basis. We conclude further that probable cause for arrest did exist at the time of the stopping. We will discuss each ground of decision in turn. The discussions will overlap somewhat.

In Adams v. Williams, *supra,* the United States Supreme Court approved an investigative stop and an immediate frisk where a police officer, operating alone in a high crime area, was advised by an informant known to him that a certain individual seated in a car had a weapon in his belt and narcotics on his person or in the car. This, the court held, justified the investigative stop and the frisk which resulted in the seizure of the gun from the belt of the individual in question. This in turn justified the arrest even though in the State of Connecticut it was not unlawful to carry a weapon as described. An immediate search of the auto disclosed another weapon and drugs and this search was held to be valid.

Our court in State v. Carpenter, *supra,* pointed out that every temporary restraint of absolute freedom is not an arrest. In that case there had been a number of burglaries committed in the city of Blair a short

time before the arrest and one or more of these had been committed with the use of a pry bar. The defendant and his companion were cruising about the city of Blair about 3 o'clock a.m. The officers followed and the defendant and his companion seemed to be trying to avoid them. The officers continued to follow and the defendant stopped on the blinker signal by the officers. The defendant, who was driving, got out of the car and came back to the police car. One of the officers went forward to the defendant's car and asked the defendant's passenger to get out. He did. As he got out his feet struck some metallic object. This caused the officer to flash his light while the door was open and he observed what he recognized as a pry bar. A closer look, using the flashlight, disclosed additional pry bars sticking out of a bag. They were in plain sight. They were not removed. The officers then asked the defendant and his companion to go to the police station. There an identity check showed they were known burglars. They were then placed under arrest.

In the case at hand, we have present a good deal more than in either Williams or Carpenter. A whole series of rape-robberies had been committed in or near the city of Hastings over a period of less than 2 years. The modus operandi of the crimes indicated the probability of a common perpetrator, who had not, up until October 1, 1971, been apprehended. Prowler complaints and burglaries had continued even beyond the last robbery and unsuccessful sexual assault on February 21, 1971. The unusual conduct of the defendant which had been observed by Elliott had been reported to the sheriff's office. It occurred in the neighborhood where the very recent prowler complaints and some burglaries had taken place. Elliott's report was based on personal observation. The reliability of his report was verified by the officer's own observations on October 1, 1971. The description of the car known to have been used by the

perpetrator of one of the rape-robberies matched that of the car belonging to the defendant. The officers also knew of the defendant's past record of sexual assaults.

If, on October 1, 1971, after Elliott's report was verified by the officers had they not determined they would stop and interrogate him they would have been remiss in their duties. It was not unreasonable especially considering the condition of the weather to ask him to come to the sheriff's office for questioning. This he agreed to do even before Hansel asked to ride with him. We believe there was no arrest up to that point and not thereafter until the discovery of the knife. From that time on it seems clear the officers would have restricted his freedom had he sought to leave.

The facts and holdings in the opinion of the Eighth Circuit in United States v. Harflinger, 436 F. 2d 928, are applicable. There the court said: "The brief detention of a citizen based upon an officer's reasonable suspicion that criminal activity may be afoot is permissible for the purpose of limited inquiry in the course of a routine investigation, and any incriminating evidence which comes to that officer's attention during this period of detention may become a reasonable basis for effecting a valid arrest." The facts in that case are in principle close to what we have here—suspicious activity and an investigative stop which resulted in the discovery of undoubted probable cause. See, also, State v. Brewer, 190 Neb. 667, 212 N. W. 2d 90.

In any event, it became clear beyond cavil that when, in addition to the circumstances which we have already discussed, Irwin attempted to dispose of the knife and Henry recognized it as fitting the unique description of the knife taken in the burglary that probable cause for arrest did exist. The knife was not discovered as a result of any search. It was discovered as a result of Irwin's voluntary attempt at concealment, which in

itself is indicative of guilty knowledge of some type.

At the time Irwin was stopped, probable cause for his arrest existed and the arrest would have been authorized by our statutes. § 29-404.02, R. S. Supp., 1972.

In Henry v. United States, *supra,* the Supreme Court of the United States said probable cause justifying an arrest without warrant exists if the facts and circumstances known to the arresting officer warrants a prudent man in believing an offense has been committed and that the defendant committed it. In this case numerous offenses had been committed and probable cause did exist for believing the defendant had committed the rapes and at least one robbery. The facts and circumstances in this case which warrant the conclusion are much stronger than in Henry v. United States, *supra,* where the Supreme Court of the United States held probable cause did not exist. In State v. Carpenter, *supra,* our court said: "The existence of probable cause must be determined by a practical and not by any technical standard." The facts here are considerably stronger than in Draper v. United States, 358 U. S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327, which is frequently cited in the opinions of the Supreme Court of the United States and upon which we relied in State v. Rice, 188 Neb. 728, 199 N. W. 2d 480.

Was Defendant Unlawfully Deprived of Counsel?

The position of the defendant in this respect is founded upon the contention that his statement made near the end of the interrogation which began on Friday night, to wit, "Maybe I should talk to an attorney," constituted a request for counsel under Miranda and that any interrogation thereafter was unlawful. We have already fully set forth the circumstances. The salient facts in the case of Frazier v. Cupp, 394 U. S. 731, 89 S. Ct. 1420, 22 L. Ed. 2d 684, are almost identical with those here, and the holding of the Supreme Court of the United States in that case governs here and requires a deter-

mination adverse to the defendant's position. In State v. Moore, 189 Neb. 354, 202 N. W. 2d 740, we summarized the pertinent holding in Frazier as follows: "There the court held that there was no denial of the right to counsel by the police on interrogation of a suspect, so as to render a confession inadmissible in a State prosecution, notwithstanding the suspect showed signs of reluctance during questioning and stated:  ' "I think I had better get a lawyer before I talk any more. I am going to get into trouble more than I am in now." ' The officer replied:  ' "You can't be in any more trouble than you are in now." '  The court said it was possible that the questioning officer took the defendant's remark not as a request that the interrogation cease but merely as a passing comment.  The defendant did not pursue the matter but continued answering questions."

### Voluntariness of the Confession

The defendant asserts that the record shows the confession was obtained by direct or implied promises, or by the exertion of improper influence.  He cites Brady v. United States, 397 U. S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747, as follows:  "To be admissible, a confession must be 'free and voluntary:  that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' "

In connection with this position the defendant relies upon an inference to be drawn from the statement made to the county attorney and to which we have earlier alluded.  That statement was:  "I have the impression they will help me with my trouble."  He seems to imply that this establishes there was some promise of psychiatric help given in order to induce the confession and this taken with the fact the defendant was kept in a solitary cell establishes involuntariness.

That question has been twice determined adversely to the defendant and it seems clear to us that such

determination is supported by the evidence. The trial court in a separate hearing as required by Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908, 1 A. L. R. 3d 1205, specifically found the confession to be voluntary and admissible. The evidence before the trial court was substantially that which we have previously recited. At the trial where all the evidence of the circumstances surrounding the confession which we have set forth was received, the question of voluntariness was submitted to the jury under NJI Nos. 14.52 and 14.52A. These instructions required that before the jury could consider the confession and admissions as evidence of guilt it had to find beyond a reasonable doubt the confessions were voluntary and the Miranda waivers were knowingly and intelligently given.

We must look at the totality of the circumstances to determine whether the trial court's finding was wrong. United States v. Watson, 469 F. 2d 362.

Immediately before the defendant made the statement on which he now relies and as a part of the same answer in which the statement appeared, he had categorically answered "No" to the question: "And there have been no promises or threats or anything?" It is to be noted further that the statement was made in an interrogation by the county attorney subsequent to the confession itself. That confession is set forth in the evidence verbatim and shows no promises or threats were made or inducements offered to obtain the confession. The interrogators Hansel and Parks unequivocally deny making any promises or threats or inducements. The Miranda warnings were thrice given and waivers made before the detailed confession was given. There was no conflict in the evidence. The defendant at the initial questioning on Friday evening indicated his desire to talk when he said: "If I thought going to jail would do me any good, I would tell you all about it." It was obvious he was weighing in his own mind

the possible benefit to himself of incarceration. At the very end of the confession on Monday he stated as with relief: "I'm just glad it's over."

The Jackson v. Denno hearing afforded to the defendant "a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." Jackson v. Denno, *supra*, 376-377; Lego v. Twomey, 404 U. S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618. The jury was properly instructed on the necessity of finding beyond a reasonable doubt the confession was voluntary. State v. McDonald, 187 Neb. 752, 194 N. W. 2d 183. We conclude as did the trial court that the prosecution had sustained its burden of proving the confession was voluntary and given after a knowing and intelligent waiver by the defendant of his Miranda rights.

The defendant contends the trial court in its determination of voluntariness did not apply the proper standard of proof because it did not base its finding upon proof beyond a reasonable doubt. He cites Parker v. State, 164 Neb. 614, 83 N. W. 2d 347; and State v. McDonald, *supra*. Neither case is applicable as both refer only to the burden before the jury. Under the holding of the United States Supreme Court in Lego v. Twomey, *supra*, determination by the trial court of the admissibility of a confession by a preponderance of the evidence is not inconsistent with the mandate of proof of guilt beyond a reasonable doubt.

### Motion for Change of Venue

The defendant contends that because of extensive pretrial publicity surrounding the crimes with which he was charged, the defendant could not get a fair trial in Adams County and that therefore the court erred in denying his motion for a change of venue. In support of this motion the defendant offered a number of affidavits of residents of Hastings in which they expressed the opinion that the defendant could not get a fair trial in

Adams County. There were also received a number of newspaper clippings and copies of radio and television news reports.

· The news accounts of the crimes were not of a sensational nature and were rather restrained. Certain articles did indicate that as the events continued to occur there was rather widespread and deep fear and suspicion. Newspaper accounts concerning Irwin's arrest and arraignment were restrained, but some of these newspaper accounts did indicate that with the defendant's arrest and coming trial the law enforcement officials were of the opinion the matter had been solved. Accounts of the preliminary hearing and the suppression hearing did not report the evidence presented as the trial court had taken appropriate precautions in an effort to protect the rights of the defendant.

The defendant relies upon Sheppard v. Maxwell, 384 U. S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600. The prejudicial publicity and demands of the press for conviction in that notorious case where the very jury which was hearing the case was clearly exposed to the inordinate pressures of the news media bear not the remotest resemblance to the case here.

The voir dire examination of the jury is set forth in full in the record. This discloses that a substantial number of the panel had formed opinions. Those who had opinions were excused for cause. Those who equivocated were eliminated by peremptory challenge.

·· A motion for a change of venue in a criminal case is addressed to the sound discretion of the trial court and its ruling will not be disturbed unless a clear abuse of discretion is shown. State v. Klatt, 187 Neb. 274, 188 N. W. 2d 821. We do not believe the record shows a clear abuse of discretion in this case.

### Denial of Motions for Mistrial

: In the course of the direct examination of one of the rape victims who could not identify the defendant, the

prosecutor asked: "Did the defendant try to do anything else?" Objection was promptly made and a motion to strike was made. The court said: "I will overrule it at the present time. I think probably there should be no reference to the defendant unless he is identified." The prosecutor then withdrew the question and restated it omitting reference to the defendant. A bit later the defense counsel moved to strike the testimony of the witness and moved for a mistrial. Both motions were overruled subject to renewal if there was no later evidence tying the defendant to the crime. The later tie-in was the confession itself. This later connection obviated any prejudice that arose from the premature reference to the defendant by the prosecutor.

In the course of the direct testimony of Lieutenant Parks relative to his interrogation of the defendant on the Monday following the defendant's arrest, the following question was asked: "What background information, if any, did you take?" The witness, after giving certain information, then stated: "I also took some information about the crime he had committed in McCook, Nebraska, prior to this." Defense counsel objected and moved for a mistrial. The county attorney moved to strike the offending statement. The defense then objected to the motion to strike. The trial judge overruled the objection to the testimony, the motion to strike, and the objection to the motion to strike. Thereafter the prosecuting attorney admonished the witness as follows: "Lieutenant Parks, if you can, please don't refer to any previous trouble." The witness then stated: "Harold told me he had been—" at which point he was interrupted by objection by defense counsel. The court then said: "Just a minute, he hasn't answered the question," and overruled the objection. The witness then continued to speak and stated: "Harold told me he had spent three months in the Regional Center at Hastings, having been sent down there from McCook,

Nebraska, and he was released from the Regional Center after spending three months there."

The so-called background material was clearly irrelevant and immaterial and the rulings of the court on objections to the testimony were erroneous. The quoted information could only be designed to influence the verdict and the persistence of the witness in pursuing his course seemed designed to that end.

In a close case the erroneous rulings of the court would call for a reversal and a new trial. Here, however, we find that under the evidence before the jury, particularly the confessions, we do not believe that the erroneously admitted evidence contributed to the verdict of guilty. We hold that under the circumstances the errors were harmless beyond a reasonable doubt.

In the course of final argument defense counsel urged upon the jury that the confession was the result of promises expressed or implied made by Hansel, and in the argument referred to the statement of the defendant to the county attorney to which we earlier referred.

In apparent response thereto the county attorney in his rebuttal stated: "I submit to you what Mr. Foote has done is, he has tried the Police Department, the Sheriff's Office; he made innuendoes that promises and inducements and things of that nature were given. I submit to you the only testimony you may take into account is what came off that witness stand. I have heard no testimony from anybody on the defense that says there were any promises or inducements made."

The defendant argues that because he was the only witness who could possibly have testified for the defense relative to the matter of inducements or promises, the last-quoted sentence constituted a comment on the failure of the defendant to testify on his own behalf.

The Supreme Court of the United States has stated the applicable rule as follows: ". . . the Fifth Amendment, in its direct application to the Federal Government,

and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Griffin v. California, 380 U. S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. den. 381 U. S. 957, 85 S. Ct. 1797, 14 L. Ed. 2d 730. The defendant relies upon our holding in Bruntz v. State, 137 Neb. 565, 290 N. W. 420, where a conviction was set aside because the prosecutor said to the jury: " 'The defendant does not get on the stand to tell you about this case.' " In that case the court referred to Hardesty v. State, 95 Neb. 839, 146 N. W. 1007, where we held the comments did not constitute prejudicial error and said: "It is not our purpose, however, to encourage violations of the statute, nor have we the right to speculate in any case on whether prejudice has resulted from the comment. The only possible aim of such a remark is to thwart the statute. If we treat violations indulgently, we shall soon—in the words of Pope—'first endure, then pity, then embrace.' We will apply the rule recognized in Hardesty v. State, supra, where the evidence of guilt is so conclusive that all will agree that no other factor could possibly have influenced the result, and not otherwise."

As we have earlier pointed out, the statement of the defendant which was put into evidence by the defense expressly negatived inducements or promises made by the police to induce the confession. The defense counsel's argument was made in disregard of this express disavowal and was founded on an inference drawn from the "impression" that the defendant had "that they wanted to help him." The argument of the prosecutor in rebuttal may, we think, be said to have been invited by the defense' argument. It does not appear that the prosecutor's statement, taken in context, is a reference to the defendant's failure to take the stand. It can be interpreted simply to be a relevant rebuttal directed to

the fact that the defendant's own statement introduced by the defense expressly negatives promise or inducement. The prosecutor's argument in this case is not at all like the statement condemned in Bruntz v. State, *supra*.

The rationale of the Supreme Court of California, in a situation similar in principle to what we have here, is applicable. There defense counsel argued that the prosecutor's failure to attack the defendant's background while the defendant was on the witness stand in connection with the admissibility of a confession was significant. The prosecutor pointed out that since the defendant had taken the stand only in reference to the voluntariness of a confession he (the prosecutor) could not ask questions on other matters. The court held that the defense invited the responsive argument and could not complain. People v. Hill, 66 Cal. 2d 536, 58 Cal. Rptr. 340, 426 P. 2d 908, cert. den. 389 U. S. 993, 88 S. Ct. 492, 19 L. Ed. 2d 487, cert. den. 390 U. S. 911, 88 S. Ct. 838, 19 L. Ed. 2d 884; 24 A. L. R. 3d 1120. That principle is applicable here.

### The Determinations Under the Sexual Sociopath Statute

The hearing to determine whether the defendant was a sexual sociopath and whether he could benefit by treatment was held before the same judge who presided at the trial on the criminal charge. The statute, section 29-2903, R. S. Supp., 1972, provides that the final determination of whether or not the convicted person is a sexual sociopath is to be made by a jury, unless the jury is waived, and the determination of whether or not he will be helped by further treatment is to be made by the judge who presides. In this case a jury was waived and it was incumbent upon the judge to make both findings.

The material evidence on the issues was presented by three psychiatrists and one psychologist. One of these witnesses, a psychiatrist, was called by the State and

the other three by the defendant. The three psychiatrists were of the opinion that the defendant was a sexual sociopath. The psychologist did not express an opinion on this point.

On the issue of whether the defendant would be benefited by treatment the evidence is mildly conflicting. The psychiatrist called by the State testified that the defendant would not be helped by further treatment. The witness founded his opinion primarily upon the defendant's past history, his lack of a sense of responsibility for his acts, and his lack of remorse. One of the defendant's psychiatrists testified that the defendant was more likely than not to be benefited by psychiatric treatment, but that he did fall into a class of individuals "least likely to benefit." A second witness called by the defendant said the question was very difficult for him to answer based on experience because he had never treated any sexual sociopaths, but he felt that any individual ought to have a therapeutic trial, but that the defendant in the light of his long history is not the best candidate for therapy. The defendant's third witness, the psychologist, believed that it would be doubtful and improbable that Irwin would be helped at the Lincoln Regional Center. The primary reason for this opinion was Irwin's particular personality difficulties. He did not seem "to have the internal pain and distress over his condition that would provide the type of motivation desirable."

The findings of the trial court were clearly justified by the evidence.

### The Constitutionality of the Sexual Sociopath Act

The claim of the defendant that the sexual sociopath act (hereinafter referred to as the Act), sections 29-2901 to 29-2910, R. S. Supp., 1972, is unconstitutional is lacking in specificity, except the inferential claim made in argument that the commitment constitutes cruel and unusual punishment. Defense counsel cite no authority.

We have nonetheless examined the matter closely and have given somewhat broader scope to the assignment than its language literally requires.

We have first examined the assignment of error and the Act in the light of Baxstrom v. Herold, 383 U. S. 107, 86 S. Ct. 760, 15 L. Ed. 2d 620; Specht v. Patterson, 386 U. S. 605, 87 S. Ct. 1209, 18 L. Ed. 2d 326; and Humphrey v. Cady, 405 U. S. 504, 92 S. Ct. 1048, 31 L. Ed. 2d 394, in which cases the Supreme Court of the United States examined the constitutionality of the New York Corrections Law, the Colorado Sex Offender's Act, and the Wisconsin Sex Crimes Act, respectively. The Act of Nebraska was not adopted until after the decisions in the first two cited cases and seems to have been drawn with reference to the standards and criteria of those decisions.

The New York Corrections Law provided for the civil commitment of a person at the conclusion of a penal sentence if it was determined that the person was mentally ill and required treatment. In that case an equal protection attack was made on the statute because although other New York statutes gave the person civilly committed the right to a de novo review by a jury trial, the Corrections Law did not. The court found the statute deficient on equal protection grounds and declared it unconstitutional. It found the act deficient also in that the determination of whether to commit the defendant to a hospital maintained by the Department of Corrections or to a civil hospital was administratively determined. The Nebraska Act is not subject to these deficiencies. Here the defendant was entitled to a jury trial, if he wanted it, to determine whether he was a sexual sociopath. Thus he was afforded maximum protection even if we were to equate commitment as a sexual sociopath with that of commitment of a person mentally ill, which of course we do not. Under our Act the determination whether to commit to the Regional Cen-

ter or to the Penal and Correctional Complex is determined after all constitutional due process safeguards and is not made administratively as in the New York Corrections Law.

In Specht v. Patterson, *supra,* the Colorado Law was held deficient in respect to due process. The commitment under the Sex Offender's Act was an alternative, just as is in the case of the Nebraska Act, and was made after psychiatric examination and report to the court. There was no provision for a hearing. The court in Specht said: "Due process, in other words, requires that he be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own." As we have pointed out in the introduction of this opinion, our Act provides all these constitutional safeguards.

In Humphrey v. Cady, *supra,* the court concerned itself with both due process and equal protection considerations. That case involved a "renewal" commitment under the Wisconsin Sex Crimes Act. The initial commitment was for treatment for a period equal to the maximum for the conviction of the crime. At the end of the period the state could petition for a 5-year renewal of the commitment if treatment was still needed. If after notice and hearing the defendant was found to be still dangerous to the public, renewal could be allowed. In respect to the equal protection issue, the court said: ". . . it is proper to inquire what justification exists for depriving persons committed under the Sex Crimes Act of the jury determination afforded to persons committed under the Mental Health Act." The Supreme Court recognized that the initial commitment triggered by a criminal conviction might not require a jury trial in order to satisfy equal protection requirements, but doubted that this would be true on the renewal commitment. It remanded the case to the Wisconsin court for a consider-

ation of that issue, saying: "An alternative justification for the discrimination might be sought in some special characteristic of sex offenders, which may render a jury determination uniquely inappropriate or unnecessary. It appears, however, that the Mental Health Act and the Sex Crimes Act are not mutually exclusive; that 'aberrations' warranting commitment under the latter might also amount to 'mental illness' warranting commitment under the former. The equal protection claim would seem to be especially persuasive if it develops on remand that petitioner was deprived of a jury determination, or of other procedural protections, merely by the arbitrary decision of the State to seek his commitment under one statute rather than the other."

As we have already noted there is no discrimination under our statute between persons committed under the Act and persons committed under statutes pertaining to the mentally ill. Under the Act greater protection is afforded rather than less because the defendant under the Act is entitled to a jury trial on the issue of whether or not he is a sexual sociopath. We consequently see nothing in Humphrey v. Cady, *supra*, which requires us to hold our statute unconstitutional.

We now turn to the cruel and unusual punishment claim as set forth in the brief of the defendant from which we quote: "The evidence at the hearing wherein Appellant was adjudged to be a sexual sociopath was conflicting in regard to whether Appellant could benefit by further treatment at the Lincoln Regional Center, or whether Appellant should be committed to the State Penal and Correctional Complex, wherein treatment could be administered under more closely controlled conditions. . . . While this court held (State v. Madary, 178 Neb. 383, 133 N. W. 2d 583) that sexual psycopath statutes, etc. are generally not criminal statutes, it would appear that incarceration in a penal and correctional complex, wherein one is separated from other inmates

and not afforded the full resources of a psychiatric institution, would be punishment of a criminal nature . . . . Appellant is serving a potential life sentence under a statute, the inherent purpose of which is rehabilitative and curative treatment. Commitment to the Nebraska Penal and Correctional Complex for an indefinite time is an indeterminable sentence and not applicable under R. R. S., § 29-2620 (1943) and has been held not to apply as punishment for the crime of rape; Haswell v. State, 167 Neb. 169, 92 N. W. 2d 161 (1958) . . . . Appellant is left in a state of limbo not knowing when, if ever, he may be released, sentenced by the Trial Court, or rehabilitated."

We consider the above contentions in the light of Specht v. Patterson, *supra;* Jackson v. Indiana, 406 U. S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435; and Davy v. Sullivan, 354 F. Supp. 1320.

In Davy v. Sullivan, *supra,* the court considered the constitutionality of the Alabama sexual psychopath law and pointed out: "Commitment is apparently not in lieu of sentence for a triggering conviction, and is not limited in duration to the maximum permissible sentence for the triggering conviction." The statute was held unconstitutional.

The Nebraska Act provides, as we have noted, that if the defendant is determined to be a sexual sociopath and further determined that he cannot be benefited by treatment, he shall be committed to the Nebraska Penal and Correctional Complex for an indefinite period. § 29-2903 (3), R. S. Supp., 1972. The question of whether he remains a sexual sociopath is subject to review at yearly intervals either on motion of the defendant or on the court's own motion. § 29-2906 (2), R. S. Supp., 1972. This review under the provisions of the Act is subject to the same due process safeguards which pertain to the initial commitment. §§ 29-2906 (2) and 29-2902 (2) to (7), R. S. Supp., 1972. The Act therefore is not subject to the criticisms made by the court in Jackson v. Indiana,

*supra,* and Davy v. Sullivan, *supra,* in these respects. Continuing commitment under the Act depends upon a finding that the defendant is still a sexual sociopath, i. e., "disposed to repeated commission of sexual offenses which are likely to cause substantial injury to the health of others." § 29-2901 and 29-2906 (2), R. S. Supp., 1972.

The Act provides that if the defendant on one of these reviews is determined no longer to be a sexual sociopath the court may "sentence the defendant on the original sex offense or release the defendant on probation." § 29-2906 (3), R. S. Supp., 1972. This provision may, depending upon the construction placed thereon, run afoul of what we believe are valid criteria stated in Davy v. Sullivan, *supra;* Specht v. Patterson, *supra;* and implicit in Jackson v. Indiana, *supra,* upon which latter two cases the court in Davy v. Sullivan, *supra,* relied. The Act would apparently permit an indefinite commitment of a sexual sociopath and then upon recovery the imposition of the maximum sentence for the offense which triggered the commitment. This possibility is characterized in the cited case as subjecting the defendant to two criminal penalties for a single offense. We believe that the indefinite commitment authorized serves two functions. The first, the protection of society and the second, punishment. The commitment and the sentence must be reasonably related to those ends. We hold that when and if the defendant is found to be no longer a sexual sociopath any sentence which the court may impose for the original conviction may not exceed the maximum sentences for rape less any time the defendant has been committed under the present order for indefinite commitment. Stated in another way, we hold that under the Act a defendant may not be confined for a period longer than the longer of the following: (1) The period during which he remains a sexual sociopath, or (2) the maximum term or terms authorized for the crime of which he was convicted and which triggered the initial

198

indefinite commitment. As so construed the Act is constitutional.

AFFIRMED.

SMITH, J., not participating.