STATE OF NEBRASKA, APPELLEE, V. DONALD MELTON, APPELLANT.

478 N.W.2d 341

Filed January 10, 1992.    No. 90-700.

Richard A. Koehler for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Claiming that the trial court erred (1) in admitting into evidence a .45-caliber pistol found in his home and (2) in failing to require the State to prove every element of the offense charged, Donald Melton appeals his conviction of possession of a firearm by a felon.

Neb. Rev. Stat. § 28-1206 (Reissue 1989) provides in relevant part that "[a]ny person who possesses any firearm with a barrel less than eighteen inches in length . . . and who has previously been convicted of a felony . . . commits the offense of possession of firearms by a felon . . . ." The offense is a Class IV felony and carries a penalty of up to 5 years' imprisonment, up to a $10,000 fine, or both. Melton does not contest the

documentary proof that he was a convicted felon at the time of the alleged crime.

The defendant was sentenced to 254 days in the Fillmore County jail. Melton was given credit on his sentence for the time he spent in jail awaiting final disposition of his case. We affirm.

In his first assignment of error, Melton claims that the .45-caliber pistol admitted into evidence was the product or fruit of an illegal search and seizure. Melton argues (1) that the pistol was seized as a result of statements made by him, although he had not been advised of his *Miranda* rights, and (2) that the statements made by him were not the product of a free will and rational intellect because he was intoxicated and mentally ill at the time the statements were made.

At approximately 10:30 a.m. on December 10, 1989, Geneva police officer John Zelenka, while in uniform and on patrol, received a radio message to meet a visitor at the back door of the Fillmore County sheriff's office. Upon the officer's arrival there, Zelenka met the defendant. Melton asked Zelenka if a police officer in Exeter, Nebraska, had had a problem the previous night. Zelenka replied that he did not know and asked Melton to explain what he meant. Melton told Zelenka that he had taken three or four shots at Officer Curt Callahan's car or residence in Exeter the previous night. Zelenka and Melton then entered the sheriff's office.

Inside the sheriff's office, Zelenka asked Melton what time the shooting incident occurred, and Melton told Zelenka that it took place around 4 or 4:15 a.m. Zelenka asked Melton the location of the gun that he had used, and Melton answered that the gun was under the stove in the kitchen at his home and that his residence was at 311 South 13th Street. Zelenka testified, "I had asked him [Melton] if we could retrieve the gun from his residence and he said, yes, we could."

Zelenka called Deputy Sheriff Steven Roemmich for assistance and then, by telephone, talked to Callahan to find out if something had happened in Exeter the previous night. When Roemmich arrived at the sheriff's office, he too talked with the defendant. Melton told Deputy Roemmich that he had been in Exeter and had shot Officer Callahan's trailer with a

.45-caliber pistol. The defendant was not under arrest when he made that statement. The deputy testified that while Melton was in the sheriff's office "he stated if we want the weapon we could get to his residence and get the weapon." Thereafter, the two officers and Melton proceeded to a deputy's office in the back of the sheriff's office. At that point, Melton said he was going back to Exeter to "get" the police officer there and said he wanted to go to the regional center. Roemmich told Melton he should not say anything because he and Zelenka were police officers, but Melton voluntarily kept talking. Roemmich told Melton that he had the right to remain silent, but the defendant retorted, "I know my rights, you don't have to tell me my rights." Melton threatened that "if you don't take me to the Regional Center, I am going to go back and I will get the police officer because I tried to call him out last night and he didn't come out and this time I will get him."

Knowing that the regional center at Hastings, Nebraska, would not admit persons who were intoxicated, Deputy Roemmich administered a breath alcohol test, which revealed that Melton had a breath alcohol level of .158 percent. At the time of the test, the defendant was in emergency protective custody because he had been involved with a firearm and had been making threats toward another person. Roemmich testified he wanted Melton's gun so the defendant would not "go back out and . . . do some other stuff with it that he said he had already done." Melton was placed in a jail cell in order to detoxify him prior to his being taken to the regional center.

Deputy Roemmich approached Melton in his cell and told the defendant that he would have to have the defendant sign a permission to search form before he would go to his house and· get the gun to which the defendant had referred. Melton replied that the deputy should just go to the residence and get the gun. Roemmich told Melton that he would not go to Melton's house unless the defendant signed the permission form. Melton signed the form.

Deputy Roemmich and Officer Zelenka then found Ronald Melton, the twin brother of Donald Melton, with whom the defendant shared a home at 311 South 13th Street in Geneva, Nebraska. The officers told Ronald that the defendant had

given them permission to go to his home and pick up a gun. Ronald Melton testified that as a resident of the house he had access to its kitchen. He voluntarily gave the officers permission to enter the home. It was Ronald who retrieved the pistol from under the stove and gave it to the officers. The barrel of the gun measured $6^{11}/_{16}$ inches in length. The gun had six shells in the cylinder, four of which had been spent. The other two shells in the cylinder were live rounds.

Deputy Roemmich signed an emergency admittance form for the defendant's admittance to the regional center. It stated in relevant part:

I have personally observed this individual [Donald Melton] *or* I have been informed by Donald Melton Personally who is a reliable person, that this individual is a mentally ill dangerous person and that he or she presents . . . [a] substantial risk of serious harm to another person or persons within the near future, as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm . . . and that the harm described is in my opinion likely to occur before Mental Health Board proceedings can be invoked.

(Emphasis supplied.)

The next day, Melton was taken to the Hastings Regional Center.

There is no evidence in the record that Melton was ever determined to be mentally ill on December 10, 1989.

The defendant unsuccessfully moved to suppress the statements he made at the sheriff's office, the written permission to search form, and the gun. At the bench trial that followed, the statements, the permission to search form, and the gun were all admitted into evidence, over objections by the defendant. On appeal, the only suppression issue raised by Melton is whether the trial court erred in failing to suppress the .45-caliber pistol found in his home. Melton claims the pistol was the product or fruit of an illegal search and seizure.

In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Tingle, ante* p. 558, 477 N.W.2d 544

(1991). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the Supreme Court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that the trial court has observed witnesses testifying in regard to such motion. *Id.*

Melton argues that the statements he made to law enforcement officers at the sheriff's office were the result of an unlawful custodial interrogation. The U.S. Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. See *id.* See, also, *State v. Melton, ante* p. 506, 476 N.W.2d 842 (1991). Melton complains that law enforcement officers should have advised him that he could refuse to consent to a search. We have held that the *Miranda* rules are not applicable to consent searches, see, *State v. Packett*, 207 Neb. 202, 297 N.W.2d 762 (1980), and *State v. Clouse*, 195 Neb. 671, 240 N.W.2d 36 (1976), and that there is no requirement that a person asked to consent to a search be advised that he may refuse consent, see, *State v. Packett, supra*, and *State v. Wood*, 195 Neb. 353, 238 N.W.2d 226 (1976).

The facts here do not support Melton's contention that his statements were the result of an improper custodial interrogation. The trial court found that the defendant was not under arrest when he went to the back door of the sheriff's office and told Officer Zelenka that he had shot at Officer Callahan's car or residence in Exeter, Nebraska, the previous night. Nor was Melton in custody when he told the officers the type of gun he had fired in Exeter and where it could be found. Since Melton was not in custody, it was not necessary for law enforcement officers to give him *Miranda* warnings concerning his right to remain silent, his right to counsel, and his privilege against self-incrimination. Moreover, when an accused initiates

a conversation, his statements do not result from interrogation and are admissible. *United States v. Perkins*, 608 F.2d 1064 (5th Cir. 1979). See *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983). Clearly, Melton initiated the conversations with Officer Zelenka and Deputy Roemmich.

Melton also claims that his statements to law enforcement officers were not the product of a "free will and rational intellect" because he was intoxicated and mentally ill at the time he made the statements. Brief for appellant at 6. The trial court found that Melton's statements were voluntary and that he knew what he was saying.

" '[T]o be admissible in evidence, an accused's statement, admission, or confession must have been freely and voluntarily made . . . .' " *State v. Porter*, 235 Neb. 476, 480, 455 N.W.2d 787, 792 (1990). Using a preponderance of evidence standard, the trial judge makes that determination before the statement, admission, or confession is admitted into evidence. See *id*. Once admitted into evidence, a defendant's statement, admission, or confession may not be considered by the fact finder as evidence of a defendant's guilt unless the fact finder first finds, beyond a reasonable doubt, that the defendant's statement, admission, or confession was freely, voluntarily, and intelligently made by the defendant. See *State v. Irwin*, 191 Neb. 169, 214 N.W.2d 595 (1974). Determinations of voluntariness are based upon an assessment of all of the circumstances and factors surrounding the making of a statement. *State v. Haynie, ante* p. 478, 476 N.W.2d 905 (1991).

To meet the requirement that a defendant's statement, admission, or confession was made freely and voluntarily, the evidence must show that such statement, admission, or confession was not the product of any promise or inducement—direct, indirect, or implied—no matter how slight. However, this rule is not to be applied on a strict, per se basis. Rather, determinations of voluntariness are based upon an assessment of all of the circumstances and factors surrounding the occurrence when the statement is made. *Id*.

There is no evidence in the record, nor is there any contention by Melton, that any of his statements are the product of or were extracted by any direct, indirect, or implied promise or

inducement.

There is evidence of Melton's intoxication at the time he talked with Officer Zelenka and Deputy Roemmich. The mere fact of intoxication is not conclusive on the issue of voluntariness of a statement or a consent given by a defendant. See *State v. Lamb, supra*. A defendant must be so intoxicated that he is unable to understand the meaning of his statements. If the trial judge is satisfied that under the totality of the circumstances the defendant was able to reason, comprehend, or resist, the statements are to be admitted. *Id*. In *Lamb*, the defendant's blood alcohol level was at .224 percent 10 minutes after he had made incriminating statements to police officers. Lamb's statements were properly admitted in evidence. *Id*. Despite the fact that Melton's breath tested .158 percent alcohol, the evidence in Melton's case supports the trial court's finding that Melton understood the meaning of his statements. The defendant sought out a police officer concerning his own activities of the previous night. The defendant accurately related the events of the previous night, when he fired three or four shots at property owned by Officer Callahan. He knew that Callahan was a peace officer. Melton related his motive for shooting at Callahan's property: "[N]obody shoots at my brother and gets away with it." Melton declared that if he was not taken to the regional center, he planned to go back to Exeter to "get" Callahan. The defendant knew, and voluntarily told the officers, not only the location of his gun but also the caliber and type of gun that he had used in Exeter. The defendant knew he had the right to remain silent in the presence of law enforcement officers. From these facts, a trial judge could properly conclude that at the time Melton made his statements and orally gave law enforcement officers permission to search his home he was able to reason, understand, and comprehend the statements he made to both Zelenka and Roemmich.

Melton also claims that his statements were involuntary because he was mentally ill. At best, the evidence is in conflict. It is true that Deputy Roemmich, as required by Neb. Rev. Stat. § 83-1021 (Reissue 1987), signed a form (not under oath) to admit Melton to the regional center and that the defendant was taken there the day after he had made the statements to law

enforcement officers. However, when Roemmich was under oath at trial, he testified, "I didn't think he [Melton] was mentally ill." From the evidence, without being clearly wrong, a fact finder could find there was no evidence that Melton was in fact mentally ill when he made his statements to law enforcement officers.

The statements made by the defendant and the circumstances surrounding his making them provide sufficient indicia of Melton's ability to understand, to reason, and to comprehend, for the trial judge to have found that the statements were the product of a free will and rational intellect.

Whether Melton's written permission for law enforcement officers to search his home is invalid because the defendant was in custody when the written consent to search was given, as Melton argues, is of no significance at this point. The written consent to search was merely cumulative to Melton's oral consent to search. The evidence is uncontroverted that Melton, while he was not in custody, not only orally consented but, indeed, orally invited Deputy Roemmich to search his home and seize his .45-caliber pistol. That consent and invitation had never been revoked. They remained valid throughout the search for, and seizure of, the .45-caliber pistol.

Under all of the circumstances of this case, it cannot be said that the trial court was clearly wrong in not suppressing Melton's statements or the pistol, which the evidence showed was in his possession. Melton's first assignment of error is without merit.

In his second assignment of error, the defendant claims that the trial court did not hold the prosecution to its burden of proving every element of the crime charged. Melton argues that the trial court failed to require the State to prove that the .45-caliber pistol retrieved from his home was a firearm.

The evidence reflects that Melton, a convicted felon, admitted having in his possession and firing a .45-caliber pistol which could be found under the stove in the kitchen of his house. The pistol was found where Melton said it could be found. It had a barrel $6^{11}/_{16}$ inches long and had been fired four times, just as Melton had volunteered to law enforcement officers. Independent evidence reflected that the defendant had

purchased the pistol from his former employer.

We determined in *State v. Lee*, 195 Neb. 348, 237 N.W.2d 880 (1976), that evidence of possession of a revolver or gun of prohibited description, which is in apparently good condition and has the characteristics and appearance commonly understood to be those of the firearm it purports to be, is prima facie evidence sufficient to go to the jury in a prosecution for possession of a firearm by a felon. The evidence herein meets this standard. The evidence shows that the pistol had been fired four times the previous night.

The defendant argues that since the term "firearm" is not specifically defined in the Nebraska statutes, it was error to presume that the pistol is a firearm. In construing a statute, it is presumed that the Legislature intended sensible, rather than absurd, results. The Supreme Court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *State v. Heckman, ante* p. 25, 473 N.W.2d 416 (1991). Clearly, a pistol is a "firearm" as used in § 28-1206.

Melton's second assignment of error is also without merit.

Even if the .45-caliber pistol was illegally seized and improperly admitted into evidence and even if Melton's statements were suppressed, there is still overwhelming independent evidence of the his guilt of being a felon in possession of a prohibited firearm. The State's documentary evidence that the defendant was a convicted felon at all relevant times in this case is uncontroverted.

The independent evidence is uncontroverted that during the period charged in the information the defendant purchased a .45-caliber pistol for $250 from his former employer. The purchase was made at the former employer's place of business, a service station in Fillmore County. The former employer testified that on the day Melton bought the gun from him, the defendant took possession of it and walked out the door with it. There was no objection to this evidence. Thus, the testimony concerning the search of Melton's house and the seizure of his .45-caliber pistol was cumulative to other relevant and properly admitted evidence of Melton's possession of a .45-caliber pistol at the time alleged in the information. That evidence supports

the court's finding that Melton was in possession of a firearm as charged. " 'Erroneous admission of evidence is harmless error and does not require reversal if the evidence erroneously admitted is cumulative and other relevant evidence, properly admitted, or admitted without objection, supports the finding by the trier of fact.' " *State v. Coleman, post* p. 800, 814-15, 478 N.W.2d 349, 358 (1992); *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989).

With or without Melton's .45-caliber pistol or his statements being admitted in evidence, there is overwhelming evidence that Melton is guilty of being a felon in possession of a firearm.

AFFIRMED.