STATE OF NEBRASKA, APPELLEE, V. RAYMOND L. MARTIN, APPELLANT.

500 N.W.2d 512

Filed April 29, 1993.   No. S-91-546.

Deborah D. Cunningham for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

Raymond L. Martin was convicted of the first degree murder of Mathew Mallory, the second degree assault on Valentine Marrufo, and two counts of using a firearm to commit those felonies and was sentenced to life imprisonment for the murder conviction and to imprisonment for terms of years for the other felony convictions. Martin contends that his confession was involuntary and should have been excluded because his confession resulted from the interrogating police officer's promise of leniency in exchange for Martin's confession.

## I. FACTUAL BACKGROUND

On September 18, 1990, Mathew Mallory and Valentine Marrufo drove from Sioux City, Iowa, to Omaha to attend an M.C. Hammer concert. Mallory and Marrufo became lost in Omaha and stopped at a gas station to ask for directions to the

Omaha Civic Auditorium, the site of the concert. At the gas station, they asked an unidentified man who was using the phone to show them how to get to the auditorium. After the man hung up the phone, he got into the car with Mallory and Marrufo. The unidentified man saw that Mallory and Marrufo were drinking whiskey from a bottle, and, according to Marrufo, the man "asked us if that's all we do. And he was telling about — telling us where we could get some drugs. Said we were going that way anyway."

The trio drove to an area of Omaha where the unidentified passenger got out of the car and walked away. Mallory and Marrufo then got out of the car; approached a group of individuals gathered in front of a residence; and, after asking the group "[who's] got it?", said: "All we want is $300 worth of powder." At some point, some members of the group believed that Mallory and Marrufo might be police officers. A man from the group proceeded to frisk Marrufo for weapons. After more conversation, Marrufo told Mallory that "there's something wrong here," and as the two started to return to their car, shots rang out. Before Marrufo was able to put the car between himself and the source of the shots, a bullet struck Marrufo once in his left leg as he stood near the car's trunk. Mallory, who was trying to reach the car's passenger door, was unprotected by the car and was shot in his back and then in his chest as he was apparently spun around by the impact from a bullet or bullets. Marrufo managed to climb into the driver's seat. Mallory, bleeding from his mouth, nose, and chest, fell into the passenger seat and slumped onto Marrufo's shoulder. Marrufo drove to a nearby gas station, where he summoned help. Mallory later died from his wounds. An autopsy revealed that Mallory had been struck by four bullets; he was hit once in his chest, once in his back, and twice in his left leg.

## II. MARTIN'S CONFESSION

Martin, who was then 19 years old, was arrested on September 19, 1990, and was taken to Omaha police headquarters for interrogation. On arrival at the police station, Martin, who was not free to leave and who had not received the *Miranda* warning or admonition, was questioned by Det. Paul

Briese and another officer for approximately 25 minutes, during which time Martin denied that he had shot Mallory or Marrufo. The officers left the interrogation room for about 10 minutes, and when they returned, Martin was read the *Miranda* warning. On resumption of the interrogation, Martin continued to deny any involvement in the shootings. However, Briese and another officer continued to press Martin for an inculpatory statement. The officers told Martin that three eyewitnesses, Brett Whitaker, Calvin Scott, and Johnny Ray, had said that Martin was responsible for shooting Marrufo in the leg. The interrogating officers told Martin:

> These three people are going to make statements against you in court and it's going to leave you all alone and you're going to get caught up in a whirlpool where they're all going to finger you, so the best thing you can do is tell the truth as to what occurred to the best of your knowledge.

For more than an hour, despite being urged to confess, Martin repeatedly denied any part in the shooting. Finally, Martin, during tape-recorded questioning, admitted his involvement in the incident as follows:

> I wasn't gonna shoot none of 'em, you know, so I picked up the gun and I aimed the gun at the car and when I pulled the trigger it didn't go off, and it was like, ah, .22 pump, and I pumped the gun again and the bullet fell out and I shot then and I shot at the car

at which point

> Brett [Whitaker] grabbed the gun from me after I did that and he was about to shoot but Johnny Ray grabbed the gun from me and . . . the one he was on the passenger's side at the front of the car and Johnny just started shootin' 'em all in the back and in the chest or in the legs.

## III. THE SUPPRESSION HEARING

At the pretrial hearing for suppression of Martin's confession, Briese, on direct examination, denied promising Martin anything "in terms of what charges would or wouldn't be filed" if Martin confessed. On cross-examination, Briese was again questioned about any promise in exchange for Martin's confession:

Q. All right. Now with respect to what was told between you and my client, did you ever indicate to him it was best to save yourself? Basically, "People are telling on you, you're going to go down by yourself unless you tell the truth"?

A. Yes. He had to tell the truth.

. . . .

Q. Did you tell him to — to cooperate and tell what his involvement was because if he did, he would not be charged with murder, he would strictly be charged with assault and use?

A. No, sir, absolutely not.

. . . .

Q. After the statement was given, did you indicate to my client that you would tell the prosecutor that Mr. Martin had cooperated?

A. Yes, sir.

At the suppression hearing, Martin testified in his own behalf:

Q. During the time that you were talking with Officer Briese, did Officer Briese make any promises or threaten you in any way to give any kind of statements?

A. When I got down to the station, he stated that it would be—it would be necessary that I tell the truth because it was three other friends of mine stating that I was involved in the shooting and that if I didn't want to go down for the murder, that I should tell the truth and that I will probably be charged with first-degree assault and use of a weapon.

Q. When does he say this in relationship to this taped statement that we have? Is it before, after, when?

A. Before.

Q. All right. Were you shown any paperwork by Officer Briese when you were in this interrogation room?

A. Yes.

Q. What were you shown?

A. I was shown a yellow copy of the charges that Johnny Ray was charged with.

Q. All right. Did you have any conversation with

Officer Briese with respect to Johnny Ray's charges?

A. I stated to him that those was some serious charges and that I don't want no charge like that.

Q. What did he say when you told him that?

A. He said, "If you don't cooperate, that's what you will be charged with."

Q. So after that was said, did you cooperate?

A. Yes.

Q. Did you give a statement?

A. Yes.

Q. Did Officer Briese at any time indicate to you that if you talked about what you knew happened, that you would just be charged with assault and use of firearm?

A. Yes.

Q. Based upon what he indicated to you, you went ahead and told your involvement; is that correct?

A. Yes.

At the conclusion of the hearing, the court denied Martin's suppression motion.

## IV. MARTIN'S JURY TRIAL

Brett Whitaker, a witness for the State, testified that he was in the group approached by Marrufo and Mallory and heard Martin say, "I'm going to jack 'em." According to Whitaker, "jack" or "jack-move" means to rob someone of money. Whitaker further testified that he saw Martin leave the group; go into a nearby house; and, carrying a rifle, return to the group, where Martin said to Mallory and Marrufo, "Give it up." Martin raised the rifle and fired twice at Mallory and Marrufo. Whitaker also testified that after Martin fired the rifle twice, Johnny Ray took the rifle from Martin's hand and continued firing at Mallory and Marrufo.

Another witness for the State, Calvin Scott, testified that he was watching TV in a nearby house when Martin entered, got a rifle, and told Scott that there were "two guys out there who wanted some dope" and that "he was going to make a jack-move on them." Martin then took the rifle and left the house. Shortly afterward, Scott heard two gunshots, but was unable to see who fired those shots. According to Scott,

"jack-move" means to rob or steal money by force.

Briese, on cross-examination, was again questioned about what he had told Martin prior to the confession:

Q. Okay. Did you ever tell him that it would be best for him if he cooperated?

A. Yes, sir.

Q. Did you promise him that you would talk to the prosecutor on the case and make the prosecutor aware of his cooperation.

A. Yes, sir.

When the State sought to introduce Martin's confession, Martin objected "on the grounds of fourth, fifth, sixth amendments, due process, voluntariness, together with state constitutional grounds and federal constitutional grounds." The trial court overruled Martin's objection and allowed the jury to hear Martin's tape-recorded confession.

Martin took the stand in his own defense and testified that Whitaker, not Martin, had brought the rifle from a nearby house and deposited that rifle close to the group that included Martin. Martin further testified that during the conversation about purchasing drugs, Mallory went to the rear of the car, where it appeared as though Mallory was going to open the trunk and obtain a weapon of some sort. Therefore, according to Martin, he shot the rifle twice. When he first pulled the trigger, the rifle did not fire. Martin then pumped the rifle, which ejected one bullet and chambered another. Next, Martin shot the rifle twice while aiming at "the car and the ground." According to Martin, he was "shooting, not to shoot at them, but to scare them away." Martin also denied making any comment concerning a "jack-move."

A jury found Martin guilty of first degree murder, second degree assault, and two counts of using a firearm to commit those felonies.

In a separate trial, Ray, one of those mentioned by Briese during Martin's interrogation, was also found guilty of charges based on the shootings of Mallory and Marrufo. Ray's convictions were affirmed by this court in *State v. Ray*, 241 Neb. 551, 489 N.W.2d 558 (1992).

## V. ASSIGNMENTS OF ERROR

Martin assigns two errors, which may be summarized: (1) Martin's statement was obtained in violation of the privilege against self-incrimination, see U.S. Const. amends. V and XIV, and (2) his confession or statement was involuntary and, therefore, should have been suppressed and excluded to accord due process in Martin's trial.

## VI. SELF-INCRIMINATION

In his appellate brief, Martin does not discuss his first assigned error, admission of his confession in violation of his privilege against self-incrimination. Apparently, Martin contends that his confession was constitutionally inadmissible because he was not advised of his privilege against self-incrimination until 25 minutes after commencement of his interrogation. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). "To be considered by an appellate court, an error must be assigned and discussed in the brief of the one claiming that prejudicial error has occurred." *Maack v. School Dist. of Lincoln*, 241 Neb. 847, 861, 491 N.W.2d 341, 350 (1992). Accord *Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 472 N.W.2d 391 (1991). See, also, Neb. Ct. R. of Prac. 9D(1)d (rev. 1992). Moreover, we note that Martin did not make any inculpatory statement before he received the *Miranda* warning or admonition. Consequently, we do not consider Martin's first assignment of error.

## VII. VOLUNTARINESS OF CONFESSION

### 1. STANDARD OF REVIEW

In determining the correctness of a trial court's ruling on a motion to suppress evidence claimed to be constitutionally inadmissible, an appellate court will uphold the trial court's findings of fact unless those findings are clearly erroneous. In reviewing a trial court's findings on a suppression motion, an appellate court recognizes the trial court as the "trier of fact" and takes into consideration that the trial court has observed witnesses testifying regarding such motion.

*State v. Thomas*, 240 Neb. 545, 547, 483 N.W.2d 527, 530

(1992). Accord, *State v. Childs*, 242 Neb. 426, 495 N.W.2d 475 (1993); *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992). "[W]hether a defendant's statements resulted from an officer's promise is a question of fact." *State v. Haynie*, 239 Neb. 478, 487, 476 N.W.2d 905, 912 (1991). Accord *State v. Ray*, 241 Neb. 551, 489 N.W.2d 558 (1992). "At a hearing to suppress evidence, the court, as the 'trier of fact,' is the sole judge of the credibility of witnesses and the weight to be given to their testimony and other evidence." *State v. Blakely*, 227 Neb. 816, 820, 420 N.W.2d 300, 303 (1988). Accord *State v. McCurry*, 228 Neb. 841, 424 N.W.2d 364 (1988). See, also, *State v. Gibson*, 228 Neb. 455, 422 N.W.2d 570 (1988). In reviewing a trial court's ruling on suppression of evidence, an appellate court does not reweigh the evidence or resolve conflicts in the evidence. See *State v. Blakely, supra*. Therefore, "[a] district court's finding and determination that a defendant's statement was voluntarily made will not be set aside on appeal unless such determination is clearly erroneous." *State v. Norfolk*, 221 Neb. 810, 820, 381 N.W.2d 120, 127-28 (1986). See, *State v. Ray, supra*; *State v. Haynie, supra.*

### 2. Voluntariness of a Confession

The general standard for determining voluntariness of a confession is expressed in *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961):

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

Accord, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985).

Furthermore, as aptly noted in *Rogers v. Richmond*, 365 U.S. 534, 540-41, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961), due

process precludes admissibility of involuntary confessions

> not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.

Therefore, the Due Process Clause of U.S. Const. amend. XIV, see *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), and the due process clause of Neb. Const. art. I, § 3, see *State v. Bodtke, supra*, preclude admissibility of an involuntary confession.

In determining whether a confession or statement is voluntary, a court must make its assessment based on an examination of all the circumstances surrounding the confession or statement. See, *Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (disapproving the "however slight" test of *Bram v. United States*, 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897)); *State v. Ray*, 241 Neb. 551, 489 N.W.2d 558 (1992); *State v. Melton*, 239 Neb. 790, 478 N.W.2d 341 (1992).

In *State v. Porter*, 235 Neb. 476, 455 N.W.2d 787 (1990), this court concluded that a defendant's confession may be involuntary and inadmissible if obtained in exchange for a promise of leniency. Subsequent to *Porter*, this court, in *Ray*, again considered the issue of voluntariness of a confession in relation to a promise of leniency. As previously mentioned, Ray was one of those implicated in the murder of Mathew Mallory, the same homicide victim as in Martin's case. In his appeal, Ray contended that his confession was involuntary as the result of the interrogating police officer's promise of leniency in exchange for Ray's confession. The interrogating officer in *Ray* was Det. Paul Briese, the same officer who questioned Martin. At the suppression hearing reviewed in *Ray*, Briese gave the following testimony:

> "Q. What did you say to him?
> "A. That it would be best for him to be truthful with me

at this point so we can get this matter resolved and find out exactly what happened.

"Q. Did you tell him his cooperation would be noted and brought to the attention of anyone?

"A. Yes, sir.

"Q. What did you tell him?

"A. I told him that his cooperation and his truthfulness in this matter would be taken to the county attorney's office.

"Q. Anything else?

"A. No. . . ."

241 Neb. at 555, 489 N.W.2d at 561. At Ray's trial, Briese also testified: " 'I make no promises or any suggestions or anything like that. I just told him what I would do: I would take his story to the prosecutor.' " 241 Neb. at 556, 489 N.W.2d at 562. On cross-examination, Briese responded to further inquiry concerning his expressions to Ray:

"Q. Okay. And you told him it would be better for him if he told you what happened?

"A. Told him it would be better for him if he told the truth.

"Q. You told him it would be better if he cooperated?

"A. Right. . . ."

*Id.*

In concluding that Ray's confession was voluntary and constitutionally admissible, this court stated in *Ray*:

"Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not . . . make a subsequent confession involuntary." *People v. Boyde,* 46 Cal. 3d 212, 238, 758 P.2d 25, 39, 250 Cal. Rptr. 83, 97 (1988), *aff'd* 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). . . .

. . . .

A defendant's statement is inadmissible only if the totality of the circumstances shows that the police offered the defendant a benefit in exchange for the statement. . . .

The benefit offered to a defendant must be definite in order to render his statement involuntary. . . .

If the benefit is offered in exchange for testimony, and the offer is definite, then the confession is involuntary and must be suppressed. In *State v. Mayhew*, 216 Neb. 761, 346 N.W.2d 236 (1984), the county attorney told the defendant that if the defendant told the truth, the county attorney would recommend that the defendant be sentenced on the instant crime concurrently with the unrelated sentence the defendant was then serving. In *State v. Smith*, 203 Neb. 64, 277 N.W.2d 441 (1979), the police officer interrogating the 15-year-old defendant told the defendant that if he confessed, the officer would try to get the case transferred to juvenile court. In both cases, this court held the confessions thereby obtained were involuntary and improperly admitted.

241 Neb. at 559, 562-64, 489 N.W.2d at 563, 565-66.

For purposes of determining voluntariness of a confession,

a "promise" is an offer to perform or withhold some future action within the control of the promisor, in circumstances where the resulting action or inaction will have an impact upon the promisee. A promise is not the same thing as a prediction about future events beyond the parties' control or regarded as inevitable. The issue, then, is whether, from the perspective of the defendant, [a police officer's] statements included a promise of a benefit which, in the defendant's understanding, the [officer] could either grant or withhold.

*United States v. Fraction*, 795 F.2d 12, 15 (3d Cir. 1986).

We, therefore, focus on Briese's statement and promise to Martin that Briese would "make the prosecutor aware of [Martin's] cooperation" and "would tell the prosecutor that Mr. Martin had cooperated" with the officers. The question is whether Briese's expressions were a promise that Martin, in a possible prosecution, would receive some legal benefit in exchange for the confession.

In *State v. Robertson*, 219 Neb. 782, 366 N.W.2d 429 (1985), we considered the question whether a deputy sheriff's promise to inform the prosecutor that Robertson was assisting in a homicide investigation rendered Robertson's subsequent confession involuntary and, therefore, constitutionally

inadmissible. In *Robertson*, we stated:

> We have considered circumstances similar to the case at hand and have addressed this very question by answering that a promise to inform a prosecuting authority about a declarant's cooperation is not an improper inducement producing involuntariness. . . . Under the circumstances the deputy's statement or remark to Robertson that her cooperation in the investigation would be made known to a prosecutor did not in and of itself render Robertson's statement involuntary.

(Citations omitted.) 219 Neb. at 788, 366 N.W.2d at 433. See, also, *State v. Muenchau and Brown*, 209 Neb. 552, 308 N.W.2d ' 824 (1981) (a defendant's cooperation in making a statement would be readily apparent to the prosecutor; hence, no benefit was offered to the defendant in exchange for making the statement). A prosecutor, anticipating use of a defendant's confession or inculpatory statement as evidence and in assessing whether the confession or statement was voluntary, would quite likely consider all circumstances surrounding the confession or statement, including the defendant's cooperation, irrespective of a police officer's promise to tell the prosecutor about the defendant's cooperation. Thus, a police officer's promise or representation that a defendant's cooperation will be brought to the prosecutor's attention does not, by itself, render the defendant's confession or statement involuntary and, therefore, constitutionally inadmissible in the defendant's trial.

Courts in several other jurisdictions have acknowledged the preceding rule that a police officer's mere promise to inform a prosecutor regarding a defendant's cooperation does not, without more, render the defendant's confession or statement inadmissible. See, e.g., *State v. Beckley*, 157 Vt. 446, 600 A.2d 294 (1991); *Layne v. State*, 542 So. 2d 237 (Miss. 1989); *Baynard v. State*, 518 A.2d 682 (Del. 1986); *Beasley v. United States*, 512 A.2d 1007 (D.C. 1986); *State v. Richardson*, 316 N.C. 594, 342 S.E.2d 823 (1986); *State v. Adkison*, 175 W. Va. 706, 338 S.E.2d 185 (1985); *State v. Whitsel*, 339 N.W.2d 149 (Iowa 1983); *State v. Vernon*, 385 So. 2d 200 (La. 1980); *Plant v. State*, 724 P.2d 536 (Alaska App. 1986); *Rowland v. State*,

460 So. 2d 282 (Ala. Crim. App. 1984); *U.S. v. Mizyed*, 927 F.2d 979 (7th Cir. 1991); *U.S. v. Leon Guerrero*, 847 F.2d 1363 (9th Cir. 1988); *Williams v. Johnson*, 845 F.2d 906 (11th Cir. 1988); *United States v. Fraction, supra*; *United States v. Baldacchino*, 762 F.2d 170 (1st Cir. 1985); *Rachlin v. United States*, 723 F.2d 1373 (8th Cir. 1983); *United States v. Hart*, 619 F.2d 325 (4th Cir. 1980); *United States v. Fera*, 616 F.2d 590 (1st Cir. 1980); *United States v. Posey*, 611 F.2d 1389 (5th Cir. 1980); *United States v. Cone*, 354 F.2d 119 (2d Cir. 1965).

Although Briese expressly promised that he would inform the prosecutor concerning Martin's cooperation, Briese did not specifically state or, as far as we can see, imply that Martin would legally benefit from Martin's confession or statement regarding the Mallory homicide and the assault on Marrufo. We realize that Martin, at his pretrial suppression hearing, testified that Briese had told him that just the assault and firearms charges would be filed against Martin in exchange for his confession. However, the district court obviously disbelieved and rejected Martin's testimony. In reviewing the result of Martin's suppression hearing, this court does not reweigh the evidence or resolve conflicts in the evidence pertaining to the requested suppression. See *State v. Blakely*, 227 Neb. 816, 420 N.W.2d 300 (1988). Consequently, in order that we reach the conclusion that Briese's promise to mention Martin's cooperation rendered Martin's confession or inculpatory statement inadmissible, we would have to hold, as a matter of law, that every promise to tell a prosecutor that a defendant had cooperated with police officers is the representation that the prosecutor will treat the defendant more favorably in disposing a criminal charge against the defendant. We cannot make such a quantum leap in the law pertaining to constitutional admissibility of a defendant's confession. We allow for the possibility that under certain circumstances, a promised benefit might be inferred, but we find nothing in the circumstances surrounding Martin's confession that leads us to any reasonable inference and ultimate conclusion that Briese's promise was actually a promise that Martin would legally benefit from his confession or inculpatory statement. For that reason, we are unable to state that the district court was clearly erroneous in its

decision that Martin's confession was constitutionally admissible in Martin's trial. We, therefore, affirm the district court's judgments entered on Martin's convictions.

AFFIRMED.