STATE OF NEBRASKA, APPELLEE, V. VIRGIL S. HARRIS, APPELLANT.
505 N.W.2d 724

Filed October 1, 1993.    No. S-92-789.

Thomas M. Kenney, Douglas County Public Defender, and Kelly S. Breen for appellant.

Don Stenberg, Attorney General, and James A. Elworth for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

FAHRNBRUCH, J.

Claiming the trial court erred in receiving into evidence crack cocaine that police officers forced him to expel from his mouth and throat, Virgil S. Harris appeals his conviction for unlawful

possession of a controlled substance with intent to deliver.

Harris claims police officers obtained the crack cocaine as a result of an illegal search and, therefore, the district court for Douglas County should have sustained his motion to suppress that evidence. We disagree and affirm Harris' conviction.

## STANDARD OF REVIEW

When examining the correctness of a trial court's ruling on a motion to suppress, this court will uphold a trial court's findings of fact unless those findings are clearly erroneous. *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993); *State v. Pope*, 239 Neb. 1009, 480 N.W.2d 169 (1992); *State v. Masat*, 239 Neb. 849, 479 N.W.2d 131 (1992). In deciding whether the trial court's findings on a motion to suppress are clearly erroneous, the reviewing court recognizes the trial court as the trier of fact and takes into consideration that the trial court has observed the witnesses testifying regarding the motion. *Martin, supra*; *State v. Melton*, 239 Neb. 790, 478 N.W.2d 341 (1992).

## FACTS

At a pretrial suppression hearing, Sgt. Mark Sundermeier of the Omaha Police Division testified that at about 10 p.m. on November 25, 1991, in the vicinity of 30th and Spencer Streets in Omaha, he observed a brown 1975 Chevrolet Malibu sedan back out of a liquor store parking lot, proceed north on 30th Street a short distance, and then pull up to a pay telephone in the same parking lot. It appeared to the officer that the driver of the Malibu was attempting to avoid him, which the officer thought was suspicious. By radio, Sundermeier ran a license-plate check with police headquarters and was advised the license plate on the Malibu, although expired, was registered to a white Datsun 280ZX.

At the pay telephone, Sundermeier contacted the driver of the Chevrolet, the defendant, Harris. A radio check on Harris revealed that he had "sort of dangerous tendencies." In talking with Harris, the officer found that Harris possessed papers indicating that he owned the Malibu. The officer issued Harris citations for expired "in transit" and fictitious license plates.

During the traffic stop, police officers Joseph Baudler and Suzanne Caldwell arrived to provide Sundermeier backup

assistance. Upon reaching Harris' automobile, while Sundermeier was handing Harris the two traffic citations, Baudler flashed a light inside the car. He saw a package of Zig-Zag cigarette papers lying on the floor. He advised Sundermeier of this fact. Sundermeier then asked Harris and his passenger, "If you have any dope in the car, would you just hand it over?" Harris and his passenger glanced at each other. The passenger gave the officers a baggie of marijuana which he had in his pocket. The passenger was then placed under arrest. A search of the front-seat area of Harris' vehicle produced an additional baggie of marijuana located in a cassette-tape case which the passenger claimed was his. Sundermeier testified that an electronic beeper of the type commonly used by drug dealers to keep in touch with one another was also found on the front seat. A battery-powered digital gram scale of a type used in drug dealing was found under the driver's seat, according to Sundermeier. From these events and discoveries, at least one of the officers suspected that somebody was dealing drugs from Harris' vehicle.

The evidence reflects, and the trial court found, that by an affirmative nod of his head and a sweeping gesture of his hand, Harris voluntarily gave Sundermeier permission to search the trunk of his car. Before the search was made, Harris volunteered, "I've got a gun in there." When Sundermeier asked him whether the gun was registered, Harris shook his head negatively. This question and the response by Harris were suppressed by the trial court. Sundermeier opened the trunk, saw a gun, arrested Harris for a weapon violation, and handcuffed him. Police confiscated a loaded 9-mm pistol and a one-shot .38 derringer from the trunk of Harris' vehicle. It was later determined that the 9-mm pistol had been reported as stolen. The trial court found that whether the pistol was registered or stolen would inevitably have been discovered through data under the control of the Omaha Police Division. See, *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984); *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992). Harris was taken to central police headquarters and placed in an interview-detention room. Subsequently, he was booked for having an unregistered firearm, possession of crack

cocaine with intent to deliver, and theft by receiving stolen property, $200 to $300. Harris was ultimately tried for possession of a controlled substance with intent to deliver and with the use or possession of a firearm during the commission of a felony. He was convicted on the controlled substance charge, and the firearm charge was dismissed by the trial court for insufficient evidence.

In this appeal, Harris does not challenge the trial court's rulings regarding the traffic stop or the searches conducted at the scene of Harris' arrest. The defendant claims only that the trial court erred when it refused to suppress evidence (cocaine) derived from the search and seizure of Harris' person at Central Police Station following his arrest for possession of an unregistered firearm. This search and the seizure of crack cocaine occurred after Harris was placed in an interview-detention room at the police station.

### THE SEARCH AND SEIZURE

Officer Caldwell testified at the suppression hearing that while she was sitting with Harris in the interview-detention room, she noticed that he was chewing something. She said she asked Harris to open his mouth. He balled up his tongue so she could not see what he had in his mouth. The trial court found that Harris again began chewing. Caldwell testified, and the court found, that the officer grabbed Harris' throat and ordered him to "spit it out." Harris did not heed the order. The record reflects, and the trial court found, that other officers and jail personnel came into the room and that a struggle ensued for approximately 2 minutes. There was evidence that when another officer first joined Caldwell, Harris stood up from where he was seated and "started to try and push us away from him, so we started to struggle with him at that point." The two officers and Harris fell to the floor.

The trial court found that when Harris did not heed Caldwell's order, external pressure was placed on the defendant to eject whatever was in his mouth and throat. There was evidence that Harris sustained a small cut to his mouth and that a small amount of blood was on the floor and on an officer's clothing following the struggle. Harris testified that he spit up

blood when he vomited the baggie and that his throat hurt for 3 or 4 days after the struggle. However, there was other testimony that Harris apparently suffered no injuries other than the cut to his mouth. At the time Harris was being booked at the jail, he told the booking officer that he had not swallowed anything and that he was all right. The trial court found that immediately after an ejection from his mouth and throat, a baggie, soggy and wet with saliva, was found in Harris' right hand. The baggie appeared to contain cocaine, according to the trial court.

The trial court found that a lateral vascular neck restraint was placed on the defendant to force him to comply with the demand to spit out what was in his mouth and throat and that a Heimlich-type maneuver was also utilized to aid in the ejection of the material. A witness testified that a lateral vascular neck restraint is a self-defense technique used by police officers to gain compliance from suspects. To execute the restraint, an officer places his arm around the suspect's neck from behind the suspect and applies pressure to the sides of the suspect's neck. In this way, the officer keeps the V of his elbow at the front of the suspect's throat, protecting the suspect's larynx and Adam's apple from injury. The restraint can be applied in three phases of escalating intensity and can cause unconsciousness after 3 to 7 seconds. Omaha police are instructed that, if a suspect who has been rendered unconscious fails to revive after 20 seconds, they are to administer emergency cardiopulmonary resuscitation (CPR). The record fails to reflect which of the three intensity phases was used upon Harris. The evidence is in conflict as to whether Harris gagged, choked, or vomited while expelling the cocaine or whether he simply spit it out. Several police officers and jail personnel testified that Harris never lost consciousness. Harris testified that he felt himself "going into a daze or a dream" for a moment and then vomited into his hand. He gave some indication that he may have passed out. A fact finder could have found that he did or did not lose consciousness. Here, the fact finder determined Harris suffered only temporary discomfort, which was minimal, and that the force used was reasonable. Officer Caldwell testified that after the struggle with Harris, she collected crack cocaine mixed with

saliva from the floor, Harris' clothing, his hands, and the baggie found in Harris' hand. The record reflects that, in all, approximately 4 grams of crack cocaine was seized.

In regard to the suppression hearing, the district court found:

> . Pressure point force was used to subdue the defendant and force compliance. The force used was not deadly force. The defendant [Harris] was not permanently injured, and his discomfort was temporary. There was no intrusion into the body of the defendant to obtain the baggie and alleged drugs. The force used was reasonable. The expected harm and actual discomfort to the defendant was minimal. To allow the defendant to swallow the plastic baggie containing alleged cocaine could certainly present a health hazard to the defendant. Society has a stake in maintaining the health of its citizens in such circumstances, either voluntarily or involuntarily. And society certainly has a concern in law enforcement retrieving contraband if it can be done so in a reasonable manner without substantial injury to the defendant and according the defendant his rights of dignity and privacy to the extent reasonable and possible under the circumstances.
>
> . . . .
>
> The force used by the Omaha Police Department to have the defendant expel the alleged contraband was not excessive, and the methods used were reasonable under all the facts and circumstances of the case.

Following a stipulated bench trial, Harris was found guilty of unlawful possession of a controlled substance with intent to deliver. He was sentenced to 2 years' imprisonment, with credit for 1 day served. Harris assigns as error the district court's refusal to grant his motion to suppress.

## ANALYSIS

Harris claims that the district court should have granted his motion to suppress because in extracting crack cocaine from his mouth and throat, Omaha police used excessive force in violation of his Fourth Amendment rights. Because it is

elementary that one has a reasonable or legitimate expectation of privacy in his or her body, there is no question that a defendant has standing to contest the search of his or her person. *State v. Johnson*, 243 Neb. 758, 502 N.W.2d 477 (1993).

An examination of whether Harris' rights were violated begins with the seminal case *Rochin v. California*, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952). The U.S. Supreme Court decided *Rochin* before *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). In *Mapp*, the U.S. Supreme Court held that the 4th Amendment to the U.S. Constitution is applicable to the states through the 14th Amendment's Due Process Clause. However, *Rochin* remains instructive in regard to intrusive body searches.

The *Rochin* Court established that police conduct crosses the line between constitutional and unconstitutional when it shocks the conscience. In that case, three police officers, acting on a tip that Rochin was dealing narcotics, entered Rochin's home without a warrant. The officers entered through an open door and then forced open the door to Rochin's bedroom. When the officers saw Rochin put two capsules in his mouth, the three officers " 'jumped upon him,' " 342 U.S. at 166, and unsuccessfully tried to extract the capsules from his mouth. Rochin was taken to a hospital and, at the direction of the officers, given an emetic solution to induce vomiting. Rochin vomited the capsules, which contained morphine. The U.S. Supreme Court characterized the police conduct as shocking to the conscience and held that it was "too close to the rack and the screw" not to have violated Rochin's constitutional rights. *Id*. at 172.

The unconscionable conduct of the police in *Rochin* was based upon the entire course of police conduct beginning with the unlawful entry of Rochin's home, rather than the specific acts of forcibly pumping Rochin's stomach or attempting to prevent Rochin from swallowing the capsules. See, *Breithaupt v. Abram*, 352 U.S. 432, 77 S. Ct. 408, 1 L. Ed. 2d 448 (1957); *Blackford v. United States*, 247 F.2d 745 (9th Cir. 1957); *People v Holloway*, 416 Mich. 288, 330 N.W.2d 405 (1982); *Foxall v. State*, 157 Ind. App. 19, 298 N.E.2d 470 (1973).

Although *Rochin* is the starting point for determining the

constitutionality of intrusive body searches, two other U.S. Supreme Court cases, *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), and *Winston v. Lee*, 470 U.S. 753, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985), have set the · standard for evaluating the reasonableness of an invasive body search under the Fourth Amendment.

In *Schmerber*, the police took a nonconsensual blood sample from the defendant while he was at a hospital being treated for injuries he suffered during an automobile collision. The sample, which established the defendant's blood alcohol level, was admitted during the defendant's trial on charges of driving while under the influence of alcohol. In determining that the taking of the blood sample did not violate the defendant's Fourth Amendment rights, the U.S. Supreme Court stated that the Fourth Amendment does not prohibit all intrusive body searches, only those that are unjustified or performed in an improper manner. Factors to be considered in deciding whether an intrusive body search is permissible are (1) the government or police must have a "clear indication that in fact such [incriminating] evidence will be found," 384 U.S. at 770; (2) the police must obtain a warrant or, in the alternative, exigent circumstances must exist, such as the imminent destruction of evidence; and (3) the police must extract the evidence using a reasonable method and a reasonable manner.

In *Lee*, the U.S. Supreme Court elaborated on the third criterion listed in *Schmerber*. The Court described a balancing test to be used in evaluating the reasonableness of intrusive searches. On one side of the equation, a court must consider the "extent to which the procedure may threaten the safety or health of the individual" and the extent to which the procedure intrudes on "the individual's dignitary interests in personal privacy and bodily integrity." 470 U.S. at 761. On the other side of the equation, a court must consider the community's interests in "fairly and accurately determining guilt or innocence." *Id*. at 762. In *Lee*, the issue was whether the state could compel the defendant to undergo surgery under general anesthesia to remove a bullet lodged in his chest.

With regard to the issue in this case, the forced expulsion of evidence from a suspect's mouth and throat, we note first that

this court considered a similar issue in *State v. Thompson, ante* p. 189, 505 N.W.2d 673 (1993). In *Thompson*, we upheld the district court's refusal to suppress evidence obtained from the defendant's mouth after police applied a lateral vascular neck restraint that rendered the defendant unconscious.

As discussed in *Thompson*, the weight of federal and state authority supports a determination that police officers may use a considerable amount of force to prevent a suspect from swallowing evidence before such force will be considered unreasonable. For example, in *Foxall v. State*, 157 Ind. App. 19, 298 N.E.2d 470 (1973), police officers executing a valid search warrant had placed the defendant under arrest, when they saw him put something in his mouth. The officers struggled with the defendant, finally forcing the defendant's mouth open with a plastic shoehorn after the defendant bit the fingers of two officers. The police recovered several packets of heroin. During the struggle, the defendant suffered three broken ribs, a bruised lower lip, hemorrhaging of one eye, and several missing teeth. The Indiana Court of Appeals found that the police did not use unreasonable force and did not violate the defendant's due process rights.

The Indiana court distinguished *Rochin* by noting that the search of Rochin was executed after police illegally entered his home without a warrant. The search of Foxall followed an arrest that had occurred during the execution of a valid search warrant. In addition, the court noted that the narcotics recovered from Rochin were recovered from his stomach, whereas the police in *Foxall* recovered the heroin packets from Foxall before he ingested them. See, also, *United States v. Harrison*, 432 F.2d 1328 (D.C. Cir. 1970) (finding that the police acted reasonably in grabbing a suspect by the throat to prevent him from swallowing an envelope which contained heroin capsules); *Jones v. U.S.*, 620 A.2d 249 (D.C. App. 1993) (holding that counsel's failure to file a motion to suppress evidence recovered from defendant through use of Heimlich maneuver was not unreasonable in that the maneuver involved no direct invasion or exposure of body); *State v. Desmond*, 593 So. 2d 965, 971 (La. App. 1992) (holding that police used reasonable force even if they grabbed defendant by the throat

to prevent him from swallowing, and "slammed him to the ground, possibly rendering him unconscious"); *People v Holloway*, 416 Mich. 288, 330 N.W.2d 405 (1982) (holding that police acted reasonably in applying pressure on defendant's jaw and placing fingers in defendant's mouth to recover tinfoil packets containing heroin and cocaine); *Hernandez v. State*, 548 S.W.2d 904 (Tex. Crim. App. 1977) (holding that police were justified in choking defendant until he spit out four balloons containing heroin); *State v. Lewis*, 115 Ariz. 530, 566 P.2d 678 (1977) (holding that police used no more force than necessary when they applied a choke hold on defendant and slapped her back to prevent her from swallowing a balloon containing heroin); *State v. Young*, 15 Wash. App. 581, 550 P.2d 689 (1976) (holding that police used reasonable force when they grabbed the defendant's throat and pinched his nose in an attempt to prevent him from swallowing narcotics); *State v. Santos*, 101 N.J. Super. 98, 243 A.2d 274 (1968) (holding that police used reasonable force when they grabbed suspect's throat and pried open his mouth to prevent him from swallowing narcotics).

Whether police action is reasonable must be determined under the totality of the circumstances, and not all attempts to prevent evidence from being swallowed have been found reasonable. In *State v. Tapp*, 353 So. 2d 265 (La. 1977), the Louisiana Supreme Court determined that New Orleans police officers had used unreasonable force in violation of the defendant's due process and Fourth Amendment rights. In *Tapp*, the defendant entered a house at which police officers were executing a search warrant. When the defendant saw the police, he put a small tinfoil object into his mouth, and five officers fought with him to force the packet out of his mouth. During the struggle, which lasted 15 to 20 minutes, one officer choked the defendant's throat and the others "pummelled defendant in the face and head with their fists." *Id.* at 267. One officer eventually held the defendant's nose to cut off breathing and succeeded in dislodging the packet. The court found the police actions unreasonable in light of the length and brutality of the fight with the defendant. The court called the intrusion a "grievous, dangerous, painful and unjustifiable assault upon a

human being." *Id.* at 269.

California and Washington courts have veered from the views of the majority of courts on the amount and type of force considered permissible. Courts in California and Washington have held that it violates due process for police to choke a person to prevent the swallowing of evidence. In *People v. Sanders*, 268 Cal. App. 2d 802, 803, 74 Cal. Rptr. 350 (1969), the court held that the use of a judo " 'choking technique' " violated the defendant's due process rights, even though the hold might have been a legitimate technique used in judo competition. The court stated that any application of force to a person's neck or throat designed to, and which does, cut off the flow of blood to the brain *so that the person passes out* constitutes choking or its equivalent. See, also, *People v. Jones*, 209 Cal. App. 3d 725, 257 Cal. Rptr. 500 (1989) (holding that where trial court found that police had applied a choke hold, the search was unlawful); *State v. Taplin*, 36 Wash. App. 664, 676 P.2d 504 (1984) (stating that whether a choke hold is excessive depends on whether the hold completely obstructs the defendant's breathing).

However, even in California, courts have held that it is not per se excessive force for police officers to exert pressure on a defendant's throat to prevent evidence from being swallowed. California courts have acknowledged that "the mouth is not a sacred orifice and there is no constitutional right to destroy or dispose of evidence." *People v. Bracamonte*, 15 Cal. 3d 394, 405 n.6, 540 P.2d 624, 632 n.6, 124 Cal. Rptr. 528, 536 n.6 (1975). Accord *People v. Jones, supra.* Consistent with this view, the California courts have held that the application of some force on the throat may be reasonable, particularly where the defendant could be harmed if allowed to swallow the narcotics. In *People v. Fulkman*, 235 Cal. App. 3d 555, 286 Cal. Rptr. 728 (1991), the court found that the police had not used an impermissible choke hold or unreasonable force where the evidence indicated that the officers applied pressure to the defendant's throat near the Adam's apple to prevent swallowing, but that the defendant was not gasping for air. See, also, *People v. Cappellia*, 208 Cal. App. 3d 1331, 256 Cal. Rptr. 695 (1989) (holding that police officers did not use excessive

force when they grabbed defendant around the lower part of his neck near the Adam's apple without putting pressure on the carotid artery or impairing the defendant's breathing); *People v. Miller*, 248 Cal. App. 2d 731, 56 Cal. Rptr. 865 (1967) (holding that evidence supported a finding that no choke hold was applied when the police held the defendant below his chin to prevent him from swallowing, but did not prevent him from breathing).

In light of these cases and the standards enunciated by the U.S. Supreme Court, we continue to consider the search of Harris by the Omaha police officers. The actions of the Omaha police officers in preventing Harris from swallowing the cocaine in his mouth can be distinguished from the actions of the police in *Rochin v. California*, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952). Unlike in *Rochin*, Harris was not searched pursuant to an illegal entry into his home. Nor was his stomach pumped after a sequence of offensive actions, as *Rochin's* was. On appeal, Harris does not claim that he was illegally in custody at the police station when he attempted to swallow the crack cocaine.

Furthermore, the search of Harris satisfied the Fourth Amendment criteria enunciated in *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), and *Winston v. Lee*, 470 U.S. 753, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985). First, the police officers had a clear indication that Harris was attempting to swallow narcotics. Harris had been arrested for a weapons violation, and police found Zig-Zag cigarette papers, sometimes used to smoke marijuana; an electronic pager; and a digital gram scale in his car. The officers also had confiscated marijuana from the passenger in Harris' car. At least one officer at the scene suspected that someone was dealing drugs from Harris' car. Harris was waiting to be strip-searched when Officer Caldwell saw him chewing something. Harris refused to let Caldwell see what was in his mouth and refused to spit the crack cocaine out upon the officer's order. Based upon these facts and her experience as a police officer, Caldwell had a clear indication that she would find incriminating evidence in Harris' mouth.

Second, the Omaha police officers were presented with

exigent circumstances. There was no time to obtain a search warrant. Under the exigent circumstances existing, the officers did not need to obtain a warrant to search Harris. Caldwell and the other officers had no way of knowing whether the suspected narcotic in Harris' mouth could be retrieved later or whether it would be destroyed when Harris ingested it. If the crack cocaine was unpackaged, the narcotic could have been metabolized before the police could obtain a blood sample or induce vomiting. The possibility existed that the evidence would be destroyed if the officers did not act immediately to prevent Harris from swallowing it. Moreover, as the district court found, Harris' health and physical safety could have been endangered had the police officers allowed Harris to swallow the suspected narcotic. This too was an exigent circumstance.

The trial court was not clearly wrong in determining that the police officers used reasonable force in extracting crack cocaine from Harris' mouth and throat. Although the determination must be made in light of the fundamental criteria laid down by the Fourth Amendment and court opinions interpreting that amendment, the reasonableness of a search is a substantive determination to be made by the trial court from the facts and circumstances of the case. See, *State v. Sharp*, 184 Neb. 411, 168 N.W.2d 267 (1969); *State v. O'Kelly*, 175 Neb. 798, 124 N.W.2d 211 (1963), *cert. denied* 376 U.S. 956, 84 S. Ct. 978, 11 L. Ed. 2d 975 (1964).

In Harris' case, the district court did not explicitly state whether Harris had been "choked" or whether he lost consciousness, but the court did determine that Harris' physical health and safety were not seriously jeopardized. Witnesses in this case testified that Harris did not lose consciousness and that he suffered only a small cut on his lip. The testimony was conflicting as to whether Harris vomited. Unlike the California cases where the courts found that the choking had cut off the suspects' air or blood supply, the district court in Harris' case found that the pressure-point force the police officers "used was not deadly force." The trial court found that "[t]he defendant was not permanently injured, and his discomfort was temporary. . . . The force used was reasonable. The expected harm and actual discomfort to the defendant was

minimal." In fact, the trial court found that Harris' health might have been endangered more by allowing him to ingest the cocaine than by forcing him to expel it from his mouth.

The district court also determined that there "was no intrusion into the body of the defendant to obtain the baggie and alleged drugs." The police used only external pressure to force Harris to comply with their demands. The intrusions upon Harris' individual interests were minimal when weighed against the community's interests in "fairly and accurately determining guilt or innocence." *Winston v. Lee*, 470 U.S. 753, 762, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985).

The district court's finding that the Omaha police officers used reasonable force in obtaining the crack cocaine from Harris was not clearly erroneous, nor was the trial court's denial of Harris' motion to suppress clearly wrong.

AFFIRMED.

WHITE, J., dissenting.

The district court found that the police used a variety of methods to extract evidence they believed the defendant, Harris, was attempting to swallow. Among those various methods, the court found that the police applied a lateral vascular neck restraint (LVNR) to Harris. Because of the life-threatening nature of the LVNR, I cannot agree with the majority's decision and would suggest that the use of the LVNR as a method of securing evidence is unreasonable.

The U.S. Constitution and the Nebraska Constitution provide that persons have a right to be secure in their persons against unreasonable searches and seizures. U.S. Const. amend. IV; Neb. Const. art. I, § 7. In addressing whether a search is reasonable, it is imperative that we recognize that a method and manner of search and seizure may implicate a person's "expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' *even if likely to produce evidence*." (Emphasis supplied.) *Winston v. Lee*, 470 U.S. 753, 759, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985). The need to collect and preserve evidence is a compelling state interest, but the Fourth Amendment and our state's counterpart serve as a constraint against unjustified intrusions or intrusions made in an improper manner. See *People v*

*Holloway*, 416 Mich. 288, 330 N.W.2d 405 (1982), *cert. denied* 461 U.S. 917, 103 S. Ct. 1900, 77 L. Ed. 2d 288 (1983).

The constitutional constraint on police action is "reasonableness." I submit that the majority's opinion impermissibly broadens the scope of "reasonableness." From the decision announced today, the majority sends the message that the police may act with unfettered discretion in the pursuit of evidence.

The U.S. Supreme Court, in *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), expressed a three-part analysis to apply when an individual has challenged the reasonableness of a search under the Fourth Amendment to the U.S. Constitution. First, the police must have a clear indication that the evidence sought will be found in the place to be searched; second, the police must have a warrant or there must exist exigent circumstances to justify the warrantless search; and third, the method used and the manner in which the search is conducted must be reasonable. See, *Winston v. Lee, supra*; *People v. Holloway, supra*.

In *Schmerber*, the Court addressed the reasonableness of a nonconsensual blood sample taken by medical personnel, at the direction of a police officer, from a person who was under arrest for driving while intoxicated. In applying the three-part analysis, the Court concluded that the blood sample was a reasonable means of securing evidence. First, the Court stated that the strong odor of alcohol on the defendant's breath after the accident gave the police a clear indication that if tested, the defendant would have a high blood alcohol level. Second, the Court found that the evidence the police were seeking was capable of disappearing over a period of time and that time had already elapsed while transporting the defendant to the hospital. Finally, the Court found that the method and manner of collecting the evidence was reasonable because a blood test is the best method to secure this type of evidence, the test was administered by medically trained personnel while at the hospital, and taking blood tests is a routine medical procedure which usually involves little risk of harm, trauma, or pain. The Court cautioned that this procedure was a minimal intrusion that was administered under "stringently limited conditions"

and that its opinion does not permit more "substantial intrusions, or intrusions under other conditions." 384 U.S. at 772.

Subsequently, the Court, in *Winston*, held that surgery to remove a bullet from the defendant was an unreasonable method of collecting evidence. The Court reiterated that the Fourth Amendment represents a constraint on searches and seizures and that a search must be justified and the method and manner employed must be reasonable. The Court stated that although there was a clear indication that the bullet was there, the method of extracting the bullet created a substantial threat to the defendant's health and safety. In reaching that conclusion, the Court compared the procedure and risks associated with taking a blood sample to those associated with general surgery. The Court stated that unlike taking a blood sample, surgery is not a routine medical procedure, and surgery necessarily involves a risk of harm, trauma, and pain to the patient. See *Jones v. U.S.*, 620 A.2d 249 (D.C. App. 1993) (stating that the use of the Heimlich maneuver to force the defendant to expel evidence he was attempting to swallow was reasonable because the Heimlich is a commonly used procedure that does not involve any risk of serious harm).

The method employed to effect a search is a distinct consideration from the manner in which it is employed. A method may be reasonable or unreasonable, and a reasonable method may be executed in a reasonable or an unreasonable manner.

Without commenting on the reasonableness of the other maneuvers employed by the Omaha police in an effort to recover evidence from Harris, I would hold that the LVNR is an unreasonable method to search for evidence. The LVNR constitutes a substantial threat to an individual's health and safety, and such a threat is not outweighed by the State's interest in collecting evidence.

The district court found that the LVNR was applied to Harris during the struggle to retrieve evidence that the police believed Harris was attempting to swallow. At the suppression hearing, Lieutenant Dunning, a training officer with the Omaha Police Division, testified that there are three levels of the LVNR and

that any of those three levels can cause unconsciousness within 3 to 7 seconds. Further, Lieutenant Dunning stated that because unconsciousness is a likely result, the officers are trained in CPR so they may revive a person who does not revive on his own after the LVNR has been applied.

Additional evidence regarding the LVNR was not admitted into evidence because the district court sustained the State's relevancy objection. However, defendant's counsel made an extended offer of proof on the LVNR. This offer of proof particularly illuminates the issue of whether the LVNR should ever be a permissible method of recovering evidence. According to the offer of proof, the LVNR is a special maneuver that the police are regularly trained and retrained on how to use. The intended purpose of the LVNR is to render the subject unconscious, and this result occurs within 3 to 7 seconds of continuous application. The subject is expected to revive, but if not, the police are trained in CPR so they may revive the subject.

The offer of proof also includes a description of four physiological factors that are involved when the LVNR is applied. Those four factors are venous compression, Valsalva's maneuver, carotid compression, and vagus stimulation. All four factors restrict or cut off the flow of blood to and from the brain, or relax certain nerves, which causes the heart to stop beating.

The severity of applying the LVNR is emphasized by the testimony given by the Omaha chief of police, James Skinner. Skinner testified that the LVNR is approved for defensive use only. The police chief stated that the LVNR is to be used as a defense maneuver against an "individual who is engaged in an active assault or attempted assault on the officer." During a redirect examination of the police chief, the following was recorded: "[Defense counsel:] Is the lateral vascular neck restraint an approved procedure in keeping a suspect from swallowing evidence? A. No, it is not." This testimony is corroborated by the police training manual. Regarding the LVNR, the manual states:

306

WHEN:

The lateral vascular neck restraint shall be applied only to those suspects who are actively resisting a police officer. This active resistance should be of such a degree that the officer would fear injury to himself/herself or others if the officer did not apply the restraint.

. . . .

DEFENSIVE USE ONLY:

The lateral vascular neck restraint shall be considered a defensive hold and shall be used for no other purpose.

(Emphasis in original.)

There is little evidence to support an argument that Harris was engaged in any aggressive behavior. According to the testimony of Officer Caldwell, who initially grabbed Harris by the throat to retrieve the evidence, she was never in fear for her safety. The only testimony indicating that safety was an issue was that of an Officer Atkinson, who stated that he always fears for his safety when a suspect is not complying with a direct order. Neither the officers involved in the struggle nor the detention technician who observed the struggle saw Harris attempt to strike, hit, or attack any of the officers.

The LVNR is designed and intended to restrict or cut off the flow of blood and to disturb the normal beating of the heart. Its use should be justified only when the police are confronted with force or threat of force of equal magnitude. Common sense dictates that an act designed to restrict the flow of blood and interrupt a normal heartbeat is an act that constitutes a substantial threat to an individual's health and safety. Such a procedure is not a routine occurrence. The retrieval of evidence does not justify the use of the LVNR.

The majority opinion notes that the district court did not "explicitly" state whether Harris lost consciousness and implies that the officers did not cut off Harris' blood or air supply because the district court found the force applied to Harris was not "deadly." The fact that Harris remained conscious does not make the use of the LVNR reasonable, and the district court's finding that the force applied to Harris was not "deadly" does not necessarily lead to the conclusion that

the use of the LVNR was reasonable.

Several courts have held that application of force to a person's throat and mouth area is a reasonable method of preventing a person from swallowing evidence. Significantly, these cases also noted that the air or blood supply of the particular defendant had not been affected by the methods employed by the police officers. See, *People v. Cappellia*, 208 Cal. App. 3d 1331, 256 Cal. Rptr. 695 (1989) (finding that police actions were reasonable when the officer placed his hands at the defendant's throat to prevent swallowing, and stating that the defendant's breathing was not impaired); *People v Holloway*, 416 Mich. 288, 330 N.W.2d 405 (1982), *cert. denied* 461 U.S. 917, 103 S. Ct. 1900, 77 L. Ed. 2d 288 (1983) (stating that it was reasonable to apply pressure to the defendant's jaw and throat and force his mouth open while another officer used his fingers to get the evidence out of the defendant's mouth, and noting that these actions did not restrict or cut off the defendant's air or blood supply); *State v. Taplin*, 36 Wash. App. 664, 676 P.2d 504 (1984) (stating that the police actions were reasonable and did not obstruct the defendant's breathing); *State v. Williams*, 16 Wash. App. 868, 560 P.2d 1160 (1977) (stating that although it is reasonable for police to place their hands around an individual's neck and mouth area to prevent the swallowing of evidence, the police may not cut off an individual's breathing or obstruct the blood flow in an effort to retrieve evidence). The normal flow of air and blood is an important consideration when determining whether a search was unreasonable. In most of these cases, the courts have examined whether the result of the police actions was the restriction of blood and air.

In *People v. Sanders*, 268 Cal. App. 2d 802, 74 Cal. Rptr. 350 (1969), the court held that the police officer violated the defendant's due process rights when he executed a judo choking technique to force the defendant to expel what was in his mouth. The court discussed a variety of things that may be done to a person to prevent him from swallowing evidence, but drew the line at choking. The judo technique applied to the defendant was particularly offensive to the court because it involved applying pressure to both the front and back of the

neck area, specifically the carotid artery. The court found that such a procedure eventually stops the flow of blood and causes the person to pass out. The court stated that any "application of force to one's neck or throat calculated to, and which does, as stated by the officer, stop 'the blood flow to the head, and then he passes out' constitutes choking or its equivalent." 268 Cal. App. 2d at 805, 74 Cal. Rptr. at 351-52. (Contrary to the majority's implication, it does not appear that this defendant was rendered unconscious by the application of the judo choke hold.) In California, the courts have uniformly held that use of a choke hold to retrieve evidence is unreasonable. See, *id.*; *People v. Jones*, 209 Cal. App. 3d 725, 731, 257 Cal. Rptr. 500, 504 (1989) (stating that the police used unreasonable force when they applied a "chokehold," as described in *Sanders, supra*, even though the defendant did not suffer a loss of air or blood flow).

In this case, the particular method employed by the police officers is designed and intended to restrict the flow of blood and to interrupt the normal beating of the heart. As with the proposed surgery in *Winston v. Lee*, 470 U.S. 753, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985), and the choke holds discussed in *Sanders* and *People v. Jones*, the Omaha police used a particular method that involves a substantial threat of serious injury to the defendant and is therefore unreasonable. The substances obtained thereby should not have been received in evidence.

SHANAHAN and LANPHIER, JJ., join in this dissent.